536 F.2d 1
 Carole BRODERICK et al., Appellants,
v.
The ASSOCIATED HOSPITAL SERVICE OF PHILADELPHIA, trading as
Blue Cross of Greater Philadelphia and the Medical
Service Association of Pennsylvania,
trading as Pennsylvania Blue
Shield, Appellees,
Candace S. Cummings et al., Intervenor-Plaintiffs.
 No. 75-2138.
 United States Court of Appeals,
Third Circuit.
 Argued March 22, 1976.
Decided May 6, 1976.
 
 Carole Broderick, Donald L. Weinberg, Harold E. Kohn, Kohn, Savett, Marion & Graf, Tom P. Monteverde, Philadelphia, Pa., for appellants.
 Raymond T. Cullen, Philadelphia, Pa., for appellee The Associated Hospital Service of Philadelphia; Morgan, Lewis & Bockius, Philadelphia, Pa., of counsel.
 Morris R. Brooke, Drinker, Biddle & Reath, Philadelphia, Pa., for appellee The Medical Service Assn. of Pennsylvania; Thomas Biddle Harvey, Jr., Philadelphia, Pa., of counsel.
 Helen H. Cutner, Philadelphia, Pa., for amicus curiae, American civil Liberties Foundation of Pennsylvania.
 GARTH, Circuit Judge.
 
 
 1
 On this appeal we must determine whether the mere requirement that Pennsylvania approve Blue Cross and Blue Shield contracts and the rates to be charged their subscribers is sufficient to constitute "state action" which would support a complaint brought pursuant to 42 U.S.C. § 1983. The plaintiffs' civil rights complaint[1] attacks the defendants' enrollment and rate policies claiming that they discriminate against married women. The district court dismissed the complaint holding that state action was not present. We affirm.
 
 I.
 
 2
 The Associated Hospital Service of Philadelphia, trading as Blue Cross of Greater Philadelphia (Blue Cross), and the Medical Service Association of Pennsylvania, trading as Pennsylvania Blue Shield (Blue Shield), are nonprofit corporations which provide medical and hospitalization insurance to the general public of Eastern Pennsylvania. Both Blue Cross and Blue Shield are subject to regulation by the Insurance Department of the Commonwealth of Pennsylvania.[2] As part of the regulatory scheme, the Insurance Department must give its prior approval to all subscriber rates and contracts of Blue Cross and Blue Shield. 40 P.S. §§ 6124(a), 6329(a).
 
 
 3
 It is undisputed as to Blue Cross, that until 1972 married men could enroll under individual non-group coverage without enrolling their wives. Married women, however, could not obtain individual non-group coverage without enrolling their husbands. The minimum rates charged a married woman for her non-group coverage (which necessarily included her husband) were more than two times greater than the rate for individual non-group coverage then available to married men.[3] In 1972 Blue Cross amended its enrollment policy to require a married man as well as a married woman to enroll a spouse in order to obtain non-group coverage.[4] The rate for such coverage is the same for a married woman and her husband as for a married man and his wife.
 
 
 4
 As to Blue Shield, from 1939 to 1972, a married woman was required to enroll her husband in order to obtain non-group coverage, while a married man was permitted to obtain individual non-group coverage without enrolling his wife.[5] The rate charged a married woman who was obliged to enroll her husband was at least two times the rate charged a married man who chose not to enroll his wife.[6] In 1972 Blue Shield amended its enrollment policy to require all married non-group subscribers to enroll their spouses.[7] The rate for such coverage was the same whether the subscriber was the husband or wife. In 1973 Blue Shield again amended its enrollment requirements so as to allow either married women or married men to obtain non-group individual coverage at one-half the cost of two-person (husband and wife) marital coverage.[8]
 
 
 5
 In summary therefore, prior to 1972, both Blue Cross and Blue Shield permitted a married woman to enroll as a non-group subscriber only if she purchased coverage which included her husband. No such requirement was imposed upon a married man. The rate applicable to such coverage was at least two times higher than the comparable individual non-group rate charged a married man.[9]
 
 
 6
 In 1972, plaintiffs Carole Broderick, Margaret Ralph and Yolanda Piccone filed their complaint as a class action[10] in the United States District Court for the Eastern District of Pennsylvania alleging that the enrollment and rate requirements of Blue Cross and Blue Shield discriminated against married women. The complaint, which sought declaratory and injunctive relief and damages, also contained a pendent state claim for violation of the Pennsylvania Constitution.[11]
 
 
 7
 On January 10, 1975, plaintiffs[12] moved for partial summary judgment seeking relief from the alleged discriminatory enrollment and rate requirements. They contended that the Pennsylvania statutory scheme which requires that the rates of Blue Cross and Blue Shield be first approved by the Pennsylvania Insurance Department created such a nexus with the Commonwealth as to constitute action taken by the defendants under color of state law.
 
 
 8
 On July 31, 1975, the district court filed its opinion in which, relying on the recent Supreme Court decision of Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), it held that the actions of Blue Cross and Blue Shield were not taken under color of state law. Thereafter, an order dismissing the action for lack of subject matter jurisdiction was entered on August 4, 1975.[13] This appeal followed.II.
 
 
 9
 In order to maintain an action under 42 U.S.C. § 1983[14] the plaintiffs were required to establish that the actions of the defendants in adopting the alleged discriminatory policies and rates constituted state action. Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). The Supreme Court has recognized that there is no easy answer to the question of whether particular discriminatory conduct is "private" or has such a state involvement or nexus which would permit relief under § 1983. Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 172, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627, 637 (1972). The facts in each case must be sifted and the circumstances weighed before a determination as to whether state action exists can be made. Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45, 50 (1961).
 
 
 10
 However, at least some guidelines have been established by the Supreme Court for the determination of the existence of state action. For state action to be found where the impetus for the discrimination is private, the record must demonstrate that the state has become significantly involved with the discriminatory action alleged. Moose Lodge No. 107 v. Irvis, 407 U.S. at 173, 92 S.Ct. at 1971, 32 L.Ed.2d at 673. In Jackson v. Metropolitan Edison Co., supra the Supreme Court employed the following analysis:
 
 
 11
 (T)he inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself. . . .
 
 
 12
 419 U.S. at 351, 95 S.Ct. at 453, 42 L.Ed.2d at 484. Such is the identical inquiry to be made here. Magill v. Avonworth Baseball Conference, 516 F.2d 1328, 1332 (3d Cir. 1975).
 
 
 13
 Plaintiffs contend that the regulation of Blue Cross and Blue Shield by the Insurance Department demonstrates the existence of the required "close nexus" with the state.[15] Plaintiffs focus exclusively on the Pennsylvania statutory requirement that the Insurance Department approve the rates and subscription agreements of Blue Cross and Blue Shield. At the time this action was commenced, the relevant statutory provision as it pertained to Blue Cross was 40 P.S. § 1404:[16]
 
 
 14
 § 1404. Regulation of rates and contracts; approval; appeal.
 
 
 15
 The rates charged to subscribers by nonprofit corporations, subject to the provisions of this act, all rates of payments to hospitals made by such corporations pursuant to the contracts provided for in this act, all acquisition costs in connection with the solicitation of subscribers to such hospital plans, the reserves to be maintained by such corporations, the certificates issued by such corporations representing their subscribers' agreements, and any and all contracts entered into by any such corporation with any hospital, shall, at all times, be subject to the prior approval of the Insurance Department. . . . (Emphasis added.)
 
 
 16
 As to Blue Shield, the relevant portion of 40 P.S. § 1442[17] provided:
 
 
 17
 § 1442. Contracts subject to supervision of insurance department.
 
 
 18
 All rates charged subscribers or groups of subscribers by any nonprofit medical, osteopathic, dental and podiatry service corporation, and the form and content of all contracts between any such corporation and its subscribers or groups of subscribers, all methods and rates of payment by such corporation to doctors of medicine, doctors of osteopathy, doctors of dental surgery or doctors of podiatry serving its subscribers, all acquisition costs in procuring subscribers, the reserves to be maintained by such corporation, and all contracts entered into by any such corporation and extending over a period of more than twelve (12) months or calling for the expenditure by the corporation of any amount in excess of twenty (20) percent of its reserves, shall be approved by the Insurance Department before they become effective. (Emphasis added.)
 
 
 19
 While it is conceded that the Commonwealth extensively regulates both Blue Cross and Blue Shield, the mere fact of state regulation alone, however, does not transform what is essentially private action into state action.[18]
 
 
 20
 As the Supreme Court stated in Moose Lodge No. 197 v. Irvis, supra (involving a claim of state action based upon the issuance of a liquor license to private clubs by the Pennsylvania Liquor Authority):
 
 
 21
 The Court has never held, of course, that discrimination by an otherwise private entity would be violative of the Equal Protection Clause if the private entity receives any sort of benefit or service at all from the State, or if it is subject to state regulation in any degree whatever. Since state-furnished services include such necessities of life as electricity, water, and police and fire protection, such a holding would utterly emasculate the distinction between private as distinguished from state conduct set forth in The Civil Rights Cases, supra, (109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835) and adhered to in subsequent decisions. Our holdings indicate that where the impetus for the discrimination is private, the State must have "significantly involved itself with invidious discriminations," Reitman v. Mulkey, 387 U.S. 369, 380, 87 S.Ct. 1627, 1634, 18 L.Ed.2d 830 (1967), in order for the discriminatory action to fall within the ambit of the constitutional prohibition.
 
 
 22
 407 U.S. at 173, 92 S.Ct. at 1971, 32 L.Ed.2d at 637.
 
 
 23
 In Jackson v. Metropolitan Edison Co., supra the Supreme Court, answered a contention similar to that raised here by stating:
 
 
 24
 The nature of governmental regulation of private utilities is such that a utility may frequently be required by the state regulatory scheme to obtain approval for practices a business regulated in less detail would be free to institute without any approval from a regulatory body. Approval by a state utility commission of such a request from a regulated utility, where the Commission has not put its own weight on the side of the proposed practice by ordering it, does not transmute a practice initiated by the utility and approved by the Commission into "state action."
 
 
 25
 419 U.S. at 357, 95 S.Ct. at 456, 42 L.Ed.2d at 487.
 
 
 26
 Jackson involved an action against the Metropolitan Edison Co., a privately owned electric utility company regulated by the Pennsylvania Public Utility Commission. The utility had filed a general tariff with the Commission. A provision of that tariff permitted the discontinuance of service on reasonable notice to any customer for non-payment of bills. Upon termination of Jackson's electrical service, an action for damages and injunctive relief under § 1983 was commenced. Jackson alleged that the termination of electrical service by the utility constituted state action because the state had authorized and approved the tariff provision. In holding that the regulation of the utility by the Pennsylvania Commission was insufficient to establish state action, the Jackson Court stated that:
 
 
 27
 At most, the Commission's failure to overturn this practice amounted to no more than a determination that a Pennsylvania utility was authorized to employ such a practice if it so desired. Respondent's exercise of the choice allowed by state law where the initiative comes from it and not from the State does not make its action in doing so "state action" for purposes of the Fourteenth Amendment.
 
 
 28
 419 U.S. at 357, 95 S.Ct. at 457, 42 L.Ed.2d at 487 (footnote omitted).
 
 
 29
 The plaintiffs attempt to distinguish Jackson from this case by contrasting state inaction (Jackson) with affirmative state action (Blue Cross/Shield). They argue that no state approval was required for the Jackson tariff provision which provided for the discontinuance of electric service.[19] By contrast, they assert that as to Blue Cross and Blue Shield, the affirmative approval of the Insurance Department is required before any rate or contract provision can become effective. Thus, they argue that in the instant case, unlike Jackson, the imprimatur of the state has been placed upon the challenged practices of the defendants thereby resulting in discriminatory state action.
 
 
 30
 We are not persuaded that the record before us supports the distinction which the plaintiffs seek to draw between Jackson and the present case. Whatever differences may exist between Blue Cross and Blue Shield as to their respective practices, none exist with respect to their enrollment underwriting policies. It is the enrollment underwriting policy which is at the heart of the plaintiffs' complaint, and the record reveals that these policies are formulated and established by Blue Cross and Blue Shield without the necessity of approval or action by the Insurance Department.
 
 
 31
 Blue Cross asserts that its policy in establishing and amending enrollment requirements is not and has not been passed upon by the Insurance Department.[20] The certificates issued by Blue Cross which represent its agreements with its subscribers are not part of the record.[21] We thus cannot ascertain whether the certificates contain any of the challenged enrollment provisions.[22] It is only these certificates and the rates charged subscribers which the Insurance Department is required to approve. 40 P.S. § 1404. As Blue Cross correctly observes, the plaintiffs have pointed "to nothing in the rate structure (and nothing in the agreements with subscribers) which in any way suggests that the Insurance Department ever considered the challenged underwriting requirement." (Blue Cross br. at 15-16). Moreover, the relationship, if any, between the challenged enrollment practices on the one hand, and the certificate and rates on the other is neither established nor ascertainable from this record.
 
 
 32
 Similarly with respect to Blue Shield, the plaintiffs have relied solely upon statutory provisions in order to establish the requisite "state action." The Blue Shield statute only requires Insurance Department approval for rates and for the form and content of its subscribers' contracts. 40 P.S. § 1442. Blue Shield contends, as does Blue Cross, that its enrollment practice is neither a "rate" nor a "contract provision." It asserts that there is no evidence that any statement or description of its enrollment practice ever appeared in a rate schedule or contract or was otherwise submitted to the Insurance Department. Blue Shield also claims that no proof in the record exists that the Insurance Department was required to approve its enrollment practices or that such practices were approved.
 
 
 33
 We agree with the defendants that, other than what appears in the respective Blue Cross and Blue Shield statutes, the record is otherwise silent as respects state involvement. With the record in this posture, the evidence of state action in this case is no more compelling than the evidence in Jackson where the Supreme Court found state action to be lacking.
 
 
 34
 Here, there is no evidence that the defendants submitted enrollment requirements for married women to the Insurance Department or that the Insurance Department considered or approved such requirements. Nor is there evidence that the enrollment requirements are part of the contracts or certificates,[23] or are otherwise intertwined with the rate structure. In short, the plaintiffs' complaint insofar as state action is concerned necessarily depends on proof of state involvement in defendants' enrollment practices, and the existence of a relationship between those practices and defendants' rates and certificates or contracts. As we have indicated, neither state involvement, nor the requisite relationship leading to state involvement, appears in this record. Unlike the requirement that the Insurance Department approve the rates and certificates or contracts, the enrollment practices of the defendants insofar as this record reveals are determined solely by them and do not require state approval.
 
 
 35
 The mere statutory requirements of prior approval of rates and certificates or contracts of subscription without more, and without a relationship to the challenged discriminatory action charged to the defendants, is insufficient to establish state action. Jackson, supra; Moose Lodge No. 107 v. Irvis, supra.
 
 
 36
 In the absence of proof that Pennsylvania has "put its own weight,"[24] on the side of the privately initiated enrollment practice, we hold, as did the district court, that on this record, plaintiffs have not carried their burden of establishing state action. We will therefore affirm the district court's order filed August 4, 1975 which dismissed the action for lack of subject matter jurisdiction.[25] Each party will bear its own costs.
 
 
 37
 SEITZ, Chief Judge (concurring).
 
 
 38
 The plaintiffs seek to distinguish Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), on the ground that the provision challenged therein became effective unless specifically disproved by the state regulatory agency while here approval by the Pennsylvania Insurance Department was required before the rates and contracts used by the defendants went into effect. Judge GARTH concludes that the record does not support such a factual distinction in that the plaintiffs were, in essence, challenging underwriting enrollment policies which did not require prior state approval. I am willing to assume that the factual distinction pressed by plaintiffs does exist because I do not believe that, on the facts of the instant case, it changes the result.[1] I read Jackson to say that mere state approval of the practice or policy of the kind presented herein does not constitute state action, at least where the challenged practice or policy was not instituted or prompted by the state. Thus, I concur in Judge GARTH's conclusion on a broader basis.
 
 
 
 [1]
 Subject matter jurisdiction was alleged to exist under 28 U.S.C. § 1331 (federal question), § 1343 (civil rights) and § 2201 (Declaratory Judgment Act)
 
 
 [2]
 Blue Cross is regulated under 40 P.S. 6121 et seq. Blue Shield is regulated under 40 P.S. 6301 et seq. These regulatory provisions are set out and discussed infra
 
 
 [3]
 Whitman affidavit, 14a
 
 
 [4]
 Blue Cross' answers to plaintiffs' interrogatories (35a) states that the amendment was made in 1973 but its brief at p. 8 and the deposition of its President, Bruce Taylor, indicate that the amendment was made in 1972. (42a)
 
 
 [5]
 Blue Shield's answers to plaintiffs' interrogatories, 39a
 
 
 [6]
 Whitman affidavit, 14a
 
 
 [7]
 Id. n. 4
 
 
 [8]
 See letter from Blue Shield's counsel of April 6, 1973. Dkt. No. 29
 
 
 [9]
 The fact that the enrollment and rate practices have been amended since 1972 to eliminate any disparity in rates and discrimination in enrollment does not result in mooting this appeal. The complaint seeks damages in addition to declaratory and injunctive relief. Even though one or more claims for relief have become moot, we nevertheless will consider the remaining live issues as supplying the requirements of a case or controversy. Powell v. McCormack, 395 U.S. 486, 496-500, 89 S.Ct. 1944, 1950-52, 23 L.Ed.2d 491, 502-504 (1969)
 
 
 [10]
 Having held that subject matter jurisdiction was lacking, the district court apparently made no class determination. That issue is not before us on this appeal
 
 
 [11]
 The Pennsylvania Constitution was amended on May 18, 1971 as follows:
 Comm.Pa.Const. Art. I, § 28.
 Equality of rights under law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual.
 It is this provision which the plaintiffs also claim was violated by the defendants' enrollment and rate practices.
 
 
 [12]
 After the filing of the complaint, Candace Cummings, Margaret Keeney and Ellen Suria moved for and were granted leave to intervene as plaintiffs. These intervenors have not joined in this appeal
 
 
 [13]
 Although the district court ruled against plaintiffs on their motion for partial summary judgment (108a), no order to that effect was ever entered. Plaintiffs nevertheless assert on this appeal that the district court erred in denying their motion. In light of our disposition, we do not reach the several procedural issues involved in this assignment of error
 
 
 [14]
 42 U.S.C. § 1983 provides in pertinent part:
 Every person who, under color of any statute . . . of any State . . . subjects . . . any . . . person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable . . . . (Emphasis added.)
 
 
 [15]
 The American Civil Liberties Foundation of Pennsylvania in its amicus brief filed with this Court argues that state action may be also be found by reason of the symbiotic relationship between the state and Blue Cross and Blue Shield. While such a relationship between the state and a private entity may establish state action, see Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) and Jackson v. Metropolitan Edison Co., supra, 419 U.S. at 357-58, 95 S.Ct. at 456-57, 42 L.Ed.2d at 487-88, plaintiffs themselves have not contended that this is such a case. In their brief on appeal, and at the hearing before the district court, plaintiffs relied exclusively on Insurance Department regulation to establish state action. The record before us is barren of any evidence to substantiate the symbiotic relationship argued by the amicus
 
 
 [16]
 40 P.S. § 1404 was repealed and replaced during the pendency of this action by 40 P.S. § 6124(a). The amended statute is identical to the former provision in all relevant aspects
 
 
 [17]
 40 P.S. § 1442 was repealed and replaced during the pendency of this action by 40 P.S. § 6329(a). The amended statute is identical to the former provision in all relevant aspects
 
 
 [18]
 We reject the plaintiffs' argument that seeks to equate the state action defense raised by Blue Cross in various antitrust contexts involving Blue Cross' hospital contracts, with the states action problem involving Blue Cross' subscription contracts required to be established under Sec. 1983. Compare Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) with Jackson, supra and Travelers Insurance Company v. Blue Cross of Western Pennsylvania, 481 F.2d 80 (3d Cir. 1973); see generally, Handler, The Current Attack on The Parker v. Brown State Action Doctrine, 76 Col.L.Rev. 1 (1976
 
 
 [19]
 See Jackson, supra at 354-55, 95 S.Ct. at 455-56, 42 L.Ed.2d at 485-86
 
 
 [20]
 The only evidence to which plaintiffs refer in support of their argument that the Insurance Department approved enrollment requirements appears in the deposition of Bruce Taylor, President of Blue Cross:
 Q. You said you had conversations with the Insurance Department about your requiring married men to enroll their spouses. Could you describe
 A. I didn't say that I did. I said the corporation did. As a matter of fact I believe that those conversations were were between counsel for the corporation as well as our staff counsel, and counsel for the Insurance Department.
 Q. Were any other members of the company there?
 A. Not to my recollection.
 Q. Are you aware of what persons in the Insurance Department they spoke with?
 A. No, I am not even aware of that. I believe it was counsel from the Department. But I am not even sure who counsel for the Department was at that time.
 Q. Was there any report made to either you or the Board of Directors?
 A. No.
 Q. Are you aware of what the content of the discussions at those meetings was?
 A. Only to the extent that the Insurance Department did not object to our making that change.
 Dep. at 54-55.
 We do not regard this equivocal and inconclusive testimony as proof that Pennsylvania was required to approve enrollment provisions and in fact did so. In any event, this testimony involves only Blue Cross. No similar testimony appears in the record as to Blue Shield.
 
 
 [21]
 The plaintiffs have the burden of establishing state action. In the district court plaintiffs' counsel represented that "In the case of the State action issue, as I stated, I have presented everything that I intend to present on the state action." (153a)
 
 
 [22]
 As noted, the record before the district court did not include the subscriber certificate issued by Blue Cross or Blue Shield's subscription contract. The amicus on appeal appended to its brief a form of Blue Cross subscription contract representing a $250 deductible subscription agreement and a form of Blue Shield subscriber contract
 The Blue Cross $250 deductible subscription agreement, which was apparently given contingent approval in June of 1972 (we do not know what kind of review the Department made), did include the following language in the section entitled "Other Changes in Status":
 The addition or removal of a child or spouse (a married woman must enroll her husband) and changes between Individual and Family Agreements and changes from Non-Group to Group Classification and enrollment under another type of Agreement issued by Blue Cross shall be made upon such terms and conditions as Blue Cross may determine. . . . (Emphasis added).
 Nothing appears in the amicus addendum with respect to any other types of subscriber agreements available or any subscriber agreements issued prior to June 1, 1972. Furthermore, the addendum does not include a Blue Cross "certificate", nor does it include the contents of such a "certificate." As the text demonstrates, the Blue Cross statute (§ 1404) requires approval only of the Blue Cross certificate representing the agreement with their subscribers and not the Blue Cross contract. We observe that even if the statute required approval of the Blue Cross subscription contract, this contract is not only equivocal with respect to the challenged enrollment provisions, but those provisions even as they appear in the contract are subject to "such terms and conditions as Blue Cross may determine." Moreover, as discussed in the text, some time in 1972 Blue Cross changed its enrollment provisions to require a married man to enroll his wife.
 As to the Blue Shield subscription contract which is found in the amicus addendum, no provision appears with respect to enrollment.
 Hence, even were we to consider the documents which appear as an addendum to the amicus brief (which we decline to do as they were never part of the district court record) we would still be unable to find sufficient evidence of affirmative state action.
 
 
 [23]
 It is arguable that in Jackson the challenged tariff provision was included in the subscribers' contract. See 419 U.S. at 354-55, 95 S.Ct. at 455-56, 42 L.Ed.2d at 485-86
 
 
 [24]
 Jackson, supra at 357, 95 S.Ct. at 456, 42 L.Ed.2d at 487
 
 
 [25]
 The plaintiffs also claim that the district court abused its discretion in refusing to exercise pendent jurisdiction over Count II of the complaint which asserts a violation of the Constitution of the Commonwealth of Pennsylvania. See note 11, supra. There is no question that a federal court has the power to entertain a pendent state claim where the federal claim has substance. However, "it has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right, . . . (and) . . . (i)f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." United Mine Workers of America v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218, 228 (1966). Having properly held that there was no federal subject matter jurisdiction, we cannot say that the district court erred in dismissing the entire action. See Braden v. University of Pittsburgh, 477 F.2d 1, 4 n.5 (3d Cir. 1973)
 
 
 [1]
 I am willing to make this assumption because I find it difficult to distinguish between the rate structures which were undeniably approved by the Insurance Department and the underlying underwriting decisions on which such rates are based. Moreover, although technically not part of the record as Judge Garth notes, the Blue Cross Subscription Agreement, approved by the Insurance Department, states that "a married woman must enroll her husband". (See Art. V, § 7 of Exhibit "B" annexed to the Brief for Amicus Curiae )