Helen McCaffrey JACKSON et al.,

v.

ASSOCIATED HOSPITAL SERVICE OF PHILADELPHIA a/k/a Blue Cross of Greater Philadelphia et al.

Civ. A. No. 73–2908.

United States District Court, E. D. Pennsylvania.

May 11, 1976.

Mary Alice Duffy, Philadelphia, Pa., for plaintiffs.

Deputy Atty. Gen. Kathleen Herzog Larkin, Harrisburg, Pa., for State defendants.

Raymond T. Cullen, Jr., Philadelphia, Pa., for Blue Cross.

Morris R. Brooke, Philadelphia, Pa., for Blue Shield.

## OPINION

HUYETT, District Judge.

■ Plaintiffs in this action are various subscribers, and in some cases their dependents, to the hospital and medical plans of defendants Blue Cross of Greater Philadelphia (Blue Cross) and Medical Service Association of Pennsylvania (Blue Shield).[1] Invoking 42 U.S.C. §§ 1981, 1983, and 1985 and the Pennsylvania Constitution, plaintiffs challenge the constitutionality of some of the Blue Cross and Blue Shield maternity benefit plans and seek declaratory and injunctive relief[2] and damages against defendant health plans as well as against

---

1. Blue Cross is "a corporation not-for-profit organized and existing to establish, maintain and operate a nonprofit hospital plan whereby hospitalization and related health benefits are provided to subscribers to such plan." Answer of defendant Blue Cross, ¶ 4. Blue Shield is "a Pennsylvania non profit corporation . . . which provides medical insurance." Answer of defendant Blue Shield, ¶ 5.

2. Plaintiffs have asked, pursuant to 28 U.S.C. §§ 2281 and 2284, that we convene a three-judge court in this action. Although plaintiffs have never articulated a recognizable ground for our so doing, we need not contend with this matter since we find it necessary to dismiss the case on general jurisdictional grounds. Even in cases in which the relief sought is more obviously that contemplated by §§ 2281 and 2284, a single district court judge has the power to dismiss a complaint for want of general subject matter jurisdiction. *Gonzalez v. Employees Credit Union*, 419 U.S. 90, 97 n. 14, 95 S.Ct. 289, 294, 42 L.Ed.2d 249, 256 (1974).

state defendants Herbert S. Dennenberg, former Pennsylvania Insurance Commissioner, and J. Finton Speller, former Secretary of Health of the Commonwealth of Pennsylvania.[3] Although this action has proceeded slowly due, in no small part, to a lack of clarity in some of plaintiffs' pleadings and memoranda of law, the advent of *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), something over a year ago signaled clearly that the primary jurisdictional base for plaintiffs' case, 42 U.S.C. § 1983, was shaky. We therefore set up a discovery period to be devoted to gathering evidence, documentary and otherwise, to aid us in determining the presence of state action under § 1983. Upon completion of discovery we held a hearing on the issue and the parties then submitted post-hearing memoranda of law which were to treat the issue of jurisdiction both under § 1983 and under § 1985(3).[4] Having considered at length the evidence presented and arguments of the parties, we find we must dismiss plaintiffs' complaint for lack of jurisdiction.

As we read plaintiffs' constitutional claim, its main thrust is that all defendants, in conspiracy with one another, have impermissibly infringed upon plaintiffs' religious exercise and their right to bear children by placing certain restrictions on Blue Cross and Blue Shield maternity benefit plans.

Although unclear whether or not all maternity plans offered by Blue Cross and Blue Shield impose these restrictions, it is apparent from the documentary evidence submitted that a good many do impose them. The two restrictions most complained of are an eight-month waiting period from the effective date of the insurance contract for eligibility for maternity benefits[5] and an increased premium to obtain maternity benefits.[6] Plaintiff Helen Jackson, for example, was denied Blue Cross maternity benefits on the basis of the eight-month restriction. In raising their constitutional challenge, plaintiffs focus particularly on the comparison between Blue Cross and Blue Shield coverage of the medical expenses associated with abortion, specifically elective abortion, and those associated with normal childbirth. Defendant health plans admittedly treat abortion as a surgical rather than an obstetrical procedure and therefore do not impose on abortion coverage the restrictions imposed on maternity coverage. This distinction, plaintiffs contend, supported by the state, amounts to an unconstitutional "state policy favoring death over life." Plaintiffs' principal claim, then, appears to be a due process attack on arbitrary governmental infringement upon first amendment rights to free religious exercise and the right to privacy. In addition to this claim, however, plaintiffs raise, without

3. The granting of injunctive relief in this case would, of course, require the addition as defendants of William Sheppard, the current Insurance Commissioner of Pennsylvania, and Dr. Leonard Bachman, the current Secretary of Health. In view of our disposition here, however, the problem is academic.

4. We saw no reason to require briefing on the issue of jurisdiction under 42 U.S.C. § 1981 since § 1981 is clearly an inappropriate jurisdictional base in this action. While controversy exists over which races may seek relief under § 1981, *see, e. g., Spiess v. C. Itoh & Co.,* 408 F.Supp. 916, 44 L.W. 2379 (S.D.Tex.1976), most courts restrict the play of this statute to the racial arena. See *Georgia v. Rachel,* 384 U.S. 780, 792, 86 S.Ct. 1783, 1790, 16 L.Ed.2d 925, 933 (1966). A few courts have extended its reach to claims based on alienage. *Presseisen v. Swarthmore College,* 71 F.R.D. 34 (E.D. Pa.1976) (Bechtle, J.) and cases cited therein.

Plaintiffs here make no claim founded on either race or alienage.

5. Although the language may differ from plan to plan, the eight-month waiting period to qualify for benefits for normal childbirth remains the same. As an example, Section III of defendant Blue Cross's Co-Pay Comprehensive Plan, Form HC 5–B, reads in part:

Hospitalization benefits . . . shall be available only to an Applicant Subscriber or spouse of Applicant enrolled under a Family Agreement in cases of pregnancy or any disease, injury or condition arising therefrom, provided, however, that in either case, such Family Agreement has been in effect for not less than eight (8) consecutive months.

6. Although the record does not determine how many of defendant insurers' plans require an increased premium for coverage for normal childbirth, defendants do not deny that some of them do.

concentrating upon them, two contentions apparently grounded in the equal protection clause of the Fourteenth Amendment. Plaintiffs allege that defendant health plans discriminate both against women in general and against single women, the former by penalizing them for a condition peculiar to their sex and the latter either by denying them access to maternity benefits or by requiring them to pay a substantial extra premium to obtain benefits. In opposing plaintiffs' claims defendants raise various defenses going both to standing of the various plaintiffs and to the merits of their claims. We will not reach these issues, however, since we hold that, as a federal court, we lack the jurisdictional power to entertain plaintiffs' suit in the first instance.[7]

Section 1983 of Title 42 reads:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Plaintiffs' successful invocation of § 1983, and its jurisdictional counterpart 28 U.S.C. § 1343(3), depends on our finding that the involvement of the Commonwealth of Pennsylvania, through its Insurance Department, in the business conduct of defendants Blue Cross and Blue Shield rises to the level of state action. If the Commonwealth's involvement does not produce state action, then the insurance practices complained of are purely private activities and reachable, if at all, not through § 1983 but through § 1985(3).

In making a finding on state action, most especially in this case in which the state involvement, whatever its level, takes the form of state regulation of private, nonprofit insurers, our Bible must be *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). In *Jackson* plaintiff filed suit under § 1983 seeking injunctive relief and damages against defendant, a privately owned and operated utility, for terminating her electrical service without notice or a hearing. She further alleged that the degree of state involvement in defendant's operation converted defendant's activities into state action. The Court, in a 6–3 decision, held that

the State of Pennsylvania is not sufficiently connected with respondent's action in terminating petitioner's service so as to make respondent's conduct in so doing attributable to the State for purposes of the Fourteenth Amendment.

419 U.S. at 358–59, 95 S.Ct. at 457, 42 L.Ed.2d at 488. Justice Rehnquist, writing for the majority, structures his analysis by first setting out a broad standard for determining when the conduct of a regulated enterprise amounts to state action and then considering, as possibly relevant to this standard, three areas of contiguity between the enterprise and the State. In making our finding here, we, in turn, will structure our analysis on that of the *Jackson* Court.

The Court begins its analysis by defining the focal consideration in assessing the presence vel non of state action under § 1983 when the alleged state actor is a regulated business:

The mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment. . . . Nor does the fact that the regulation is extensive and detailed, as in the case of most public utilities, do so. . . [T]he inquiry must be whether there is a sufficiently close nexus between the

---

7. In dismissing this action for lack of jurisdiction, we also bypass a decision on plaintiffs' motion for class determination. Plaintiffs have never clearly pleaded the precise class outlines they wish us to endorse. We find, for instance, two classes identified in the complaint and five in the motion for class action determination. Nor do plaintiffs designate which of the named plaintiffs represent any of these classes. The confusion having persisted to date, we will not now attempt to unravel it.

State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.

*Id.* at 350–51, 95 S.Ct. at 453, 42 L.Ed.2d at 483 (citations omitted). Defendants Blue Cross and Blue Shield, as non-profit providers of health insurance, are unquestionably subject to state regulation. Since February 1973 they have both been covered by a separate statutory scheme applicable to non-profit insurers, 40 P.S. § 6101 *et seq.* and § 6301 *et seq.* This determination, however, as the *Jackson* Court points out, far from being dispositive, is only the jumping off point for analysis.

In deciding, in the context of *Jackson*, whether or not there existed "a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself," the Court considers, as the first of three areas of possibly relevant inquiry, the status of Metropolitan Edison as a state-created monopoly. Although the Court disputes Metropolitan's monopoly status, it goes on to conclude:

> But assuming that [the public utility had a monopoly status], this fact is not determinative in considering whether Metropolitan's termination of service to petitioner was "state action" for purposes of the Fourteenth Amendment. . . .
> In [*Public Utilities Commission v. Pollak*, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952), and *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972)], there was insufficient relationship between the challenged actions of the entities involved and their monopoly status. There is no indication of any greater connection here.

*Id.* at 351–52, 95 S.Ct. at 454, 42 L.Ed.2d at 484. The crucial point here for the purposes of our analysis is that Blue Cross and Blue Shield, although tax-exempt,[8] do not even arguably enjoy a protected monopoly. They compete with the commercial insurance market. In fact according to the dep-

osition of Thomas Chepel, a rate analyst for the Pennsylvania Insurance Department:

> When you are talking about comparing a Blue Cross and Blue Shield non-group subscriber contract with an individual accident and health insurance policy written by a commercial accident and health insurance carrier, you would find a cost difference that is significant; that being that Blue Cross and Blue Shield would provide better benefits at a more reasonable cost. *When you are talking about the large group cases, the cost of Blue Cross and Blue Shield providing comparable benefits with a large commercial accident and health insurer, it can become very close. It can be very competitive.*

Dep. at 54. Thus the extent to which a link between monopoly status and conduct challenged might have aided the *Jackson* plaintiff cannot bolster plaintiffs' argument here. The lack of monopoly status on the part of Blue Cross and Blue Shield cuts further against plaintiff's position when one notes that both Justice Douglas and Justice Marshall base their dissents, in important part, on the fact of Metropolitan's state-protected monopoly.

The Court next considers the significance of a regulated business's activity being, arguably, in the public interest:

> If we were dealing with the exercise by Metropolitan of some power delegated to it by the State which is traditionally associated with sovereignty, such as eminent domain, our case would be quite a different one. . . . The Pennsylvania courts have rejected the contention that the furnishing of utility services are either state functions or municipal duties. Perhaps in recognition of the fact that the supplying of utility service is not traditionally the exclusive prerogative of the State, petitioner invites the expansion of the doctrine [that state action is present in the exercise by a private entity of powers traditionally exclusively reserved to the State] into a broad principle that all businesses "affected with the

---

8. 40 P.S. § 6103(b) and § 6307(b).

public interest" are state actors in all their actions.

We decline the invitation . . . .

*Id.* at 352–53, 95 S.Ct. at 455, 42 L.Ed.2d at 485 (citations omitted). Applying this reasoning to the case at hand, we find, as we did when considering the Court's position on Metropolitan's monopoly status, that plaintiffs here have an even weaker case than did plaintiff in *Jackson.* Certainly, if the supplying of utility service to private homes, service that assures heat and light in these homes, is not "traditionally associated with sovereignty," then the supplying of health insurance is not so associated.

The final area of inquiry under the *Jackson* Court's analysis is the one which, on the particular facts of this case, presents the closest question. In commenting on the import, in an examination into the presence of state action, of the state's authorizing and approving a termination procedure by approving the general tariff in which it was contained, the Court points out:

> This provision has appeared in Metropolitan's previously filed tariffs for many years and has never been the subject of a hearing or other scrutiny by the Commission.

*Id.* at 354, 95 S.Ct. at 455, 42 L.Ed.2d at 486. The Court then goes on, however, to discuss *Public Utilities Commission v. Pollak,* 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952), in which the Court upheld the constitutionality of a piped music system on the buses of a transit line regulated by the District of Columbia Utilities Commission. Although the Court questions whether there was an explicit finding of state action in *Pollak,* the Court distinguishes *Pollak* from *Jackson* in the following crucial terms:

> The District of Columbia Public Utilities Commission, on its own motion, commenced an investigation of the effects of the piped music, and after a full hearing concluded not only that Capital Transit's practices were "not inconsistent with

public convenience, comfort, and safety," but also that the practice "in fact, through the creation of better will among passengers, . . . tends to improve the conditions under which the public rides." Here, on the other hand, there was no such *imprimatur* placed on the practice of Metropolitan about which petitioner complains. . . . Approval by a state utility commission of [a request] from a regulated utility, where the Commission has not put its own weight on the side of the proposed practice by ordering it, does not transmute a practice initiated by the utility and approved by the Commission into "state action." At most, the Commission's failure to overturn this practice amounted to no more than a determination that a Pennsylvania utility was authorized to employ such a practice if it so desired. Respondent's exercise of the choice allowed by state law where the initiative comes from it and not from the State, does not make its action in doing so "state action" for purposes of the Fourteenth Amendment.

*Id.* 419 U.S. at 356–57, 95 S.Ct. at 456, 42 L.Ed.2d at 487 (citations omitted).

The primary factual difference, although, we conclude, not a viable distinction, between the action under consideration here and the *Jackson* case is that in the present case there has been some recent state activity focusing at least on the general areas out of which plaintiffs' complaints arise.[9] The documents and other materials produced for the state action hearing tend to show the following state involvement in the issues raised by questions about women's insurance in general and about maternity benefits in particular. Correspondence among defendants and between the Pennsylvania Insurance Department and interest groups reveals that the Insurance Department was to some degree aware of questions about women's insurance and maternity and abortion coverage as early as 1971. The earliest statement in evidence from the

---

9. Although the most relevant state activity occurred in 1974 after this complaint was filed and jurisdiction must be determined as of the filing date, we will proceed with our analysis since this discrepancy might be correctable by a motion under Fed.R.Civ.P. 15 or perhaps by withdrawing and refiling the complaint.

Insurance Department shows the Department's concern with the subject of maternity benefits but not a concern particularly relevant to the facts of this case. In a March 4, 1971, release (Ex. V), the then Commissioner Denenberg recommended that Blue Cross study the following question:

Should maternity benefits (except for complications) be excluded from coverage, as such expenses are better treated by budgeting or low cost loans than insurance?

More relevant here are the 1974 activities of the Insurance Department. On January 12, 1974, a notice appeared in the Pennsylvania Bulletin, Vol. 4, No. 2 (Ex. A to Doc. # 53), in which the Insurance Department directed insurers covered by the statutory scheme regulating commercial insurers, 40 P.S. § 341 *et seq.,* to submit to the Department all policies which made distinctions based on sex. The notice provided, however, that

restrictions or modifications based solely on the costs or other circumstances surrounding a normal pregnancy such as an exclusion for costs of a normal pregnancy would not be reported.

Any implication raised by this proviso that the Insurance Department was not concerned with maternity benefits was contradicted a week later when the following release appeared in the Pennsylvania Bulletin, Vol. 4, No. 3 (Ex. B to Doc. # 53):

The Commissioner seriously questions the necessity and propriety of any discrimination on the basis of sex in insurance coverage or rates or the provision of health service benefits, including discrimination based on the occurrence of normal pregnancy.

. . . . .

[A] formal request has been made for an opinion from the Attorney General on the following questions:

. . . . .

3. Is discrimination on the basis of normal pregnancy prohibited by Federal or State law?

. . . . .

4. If discrimination on the basis of normal pregnancy is not necessarily prohibited by Pennsylvania or Federal law, may the Commissioner, under his existing statutory powers and for good reasons, prohibit such discrimination?

Furthermore, in March 1974 the Department issued a publication entitled a "Mini Guide to Women's Insurance Rights" (Ex. D to Doc. # 53), and in June 1974 the Insurance Commissioner's Task Force on Women's Insurance Problems issued its report and recommendations (Ex. 2 to depositions of Paul Henning and Thomas Chepel). Both documents challenge the maternity coverage practices complained of here.[10] Finally, in the Fall of 1974 correspondence between the Insurance Department and Blue Cross and Blue Shield (Ex. V and Y–1 to 4) discloses that at the request of the Department defendant insurers were submitting a paper examining the subject of maternity coverage. Now, somewhat over a year later, the Insurance Department still has the matter of maternity coverage under consideration; the Attorney General has not yet issued an Opinion Letter.

█ If we read *Jackson* as holding that when a state regulatory agency focuses upon and investigates particular activities of a regulated business, this focus itself may tip the balance in favor of finding state action, we could perhaps find state action in this case.[11] We do not so read

10. Exhibit E to E–3 attached to Doc. # 53 apparently represents typed copies of two pages from a 1972 Report of the Pennsylvania Abortion Law Commission in which maternity coverage practices are also challenged.

11. We note here our agreement with Justice Douglas that the majority in *Jackson* appear to depart from a full balancing analysis and that

their analysis is "fundamentally sequential rather than cumulative." 419 U.S. at 363, 95 S.Ct. at 459, 42 L.Ed.2d at 491. In this case, however, because of both its factual similarities to and differences from *Jackson,* we would reach the same result whether we viewed the *Jackson* Court's analysis as one which balanced relevant considerations or examined them seriatim.

*Jackson,* however. Although the Court in *Jackson* points out that the state had apparently never focused on Metropolitan's termination procedures (or lack of them), the key language of the opinion characterizing the level of state encouragement necessary to convert private into state action relates that the State in *Jackson* had placed

> no . . . *imprimatur* . . . on the practice of Metropolitan about which petitioner complains. . . . Approval by a state utility commission of [a request] from a regulated utility, where the Commission has not put its own weight on the side of the proposed practice by ordering it, does not transmute a practice initiated by the utility and approved by the Commission into "state action."

*Id.* at 357, 95 S.Ct. at 456, 42 L.Ed.2d at 487. Viewing the facts of this case in light of this language, we cannot say that Pennsylvania has, either overtly or covertly, placed its *imprimatur* on the insurance practices complained of. Certainly it has not "put its own weight on the side of the proposed practice by ordering it." [12] Rather it has challenged the practices and is currently investigating them. Under these circumstances and relying on *Jackson,* we find, at least to date, no involvement of the state in the challenged insurance activities sufficient to transform those activities into state action.

Before concluding our examination of state action, however, we feel obliged to make two observations. First, an undeniable implication of the Court's opinion in *Jackson* is that the answer to the question of whether or not private conduct has been transformed into state action can change as circumstances change. In other words, although we fail to find state action under the facts of this case, a similar complaint filed subsequent to a substantial change in the state's posture on the matters raised here might compel a contrary finding on the issue of state action. Second, we do not read the Court's opinion to hold that the absence of any *formal* state pronouncement on a particular matter brought to its attention forever precludes a finding of state action. An inordinate delay between a state inquiry into or investigation of a practice coupled with evidence of informal or covert encouragement of a practice might give rise to a finding of state action.[13]

Finally, our finding that, under the facts of this case, state action requisite to sustain jurisdiction under 42 U.S.C. § 1983 is lacking means that the conspiracy alleged here is, for jurisdictional purposes, a private one and may be challenged effectively, given plaintiffs' jurisdictional statement, only under 42 U.S.C. § 1985(3).

Section 1985(3) of Title 42 [14] reads in relevant part:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

In determining whether or not plaintiffs' allegations of conspiracy state a cause of action under § 1985(3) and its jurisdictional

---

**12.** Nor has any state official "participated in the decisional process setting forth" the restrictions on maternity coverage, "the precise 'challenged activity'." *See Magill v. Avonworth Baseball Conference,* 516 F.2d 1328, 1335 (3d Cir.1975).

**13.** Although the Attorney General's Opinion Letter on the issues involved here has been pending a year, we do not find this amount of time, given the complexities of the issues, an inordinate delay.

**14.** Plaintiffs do not in their complaint designate subsection 3 of § 1985 as the particular statutory authority they are invoking; they have cited § 1985 generally. We assume from the facts as alleged that it is subsection 3 that plaintiffs rely upon. Ordinarily any doubt generated by the form of the jurisdictional allegations in the complaint would be resolved by briefing the jurisdictional issues, as the parties were requested to do in this case. Plaintiffs' brief, however, never mentions § 1985.

counterpart, 28 U.S.C. § 1343(1), one must, of course, begin with *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), which overruled *Collins v. Hardyman,* 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253 (1951), by holding that in some situations § 1985(3) reaches wholly private conspiratorial activity. The key section of *Griffin,* illuminating the nature of the activity proscribed by § 1985(3) explains:

> The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' actions.

403 U.S. at 102, 91 S.Ct. at 1798, 29 L.Ed.2d at 348. Based on this language most courts approach *Griffin* problems by deciding first whether or not a plaintiff has alleged the existence of a discernible class and of the requisite class-directed animus or hostile motive. Courts then go on, as did the *Griffin* Court, to identify "a source of congressional power to reach the private conspiracy alleged by the complaint." 403 U.S. at 104, 91 S.Ct. at 1799, 29 L.Ed.2d at 349.

▮▮ In *Griffin* the Court had no difficulty in finding that plaintiffs had alleged the necessary class-based animus. The *Griffin* plaintiffs, a group of Blacks, alleged that defendants dragged them from their car on a public highway, beat them because defendants mistakenly believed that one of them was a civil rights worker, and intended to prevent them from exercising their first and fifth amendment rights and from traveling freely. Nor did the Court have any difficulty in finding that congressional power to reach such a private conspiracy resided in the Thirteenth Amendment and in the constitutional right to travel, neither of which is circumscribed by the concept of state action. Under *Griffin,* then, a cause of action properly brought under § 1985(3) must allege the existence of a class "racial

or perhaps otherwise" and the existence of a discriminatory animus or hostile motive triggering defendant's conduct. In addition there must be a valid source of congressional power to reach the particular conspiracy alleged. The *Griffin* Court deliberately avoided, however, defining the limits under § 1985(3) on class characteristics and on congressional power to reach private conspiracy. And, in fact, what case law subsequent to *Griffin* has demonstrated most conclusively is that these questions of limitation the Court left open do not suggest obvious answers. We need not here, however, consider possible limitations on congressional power; nor need we confront any borderline determination of class composition since we find in plaintiffs' complaint appropriate allegations neither of the existence of any readily discernible class or of the invidiously discriminatory animus requisite to a § 1985(3) action.

The range of possibilities for the composition of a *Griffin* class, was, as noted, left unresolved by the Court, Justice Stewart merely commenting in a footnote that

> [w]e need not decide, given the facts of this case, whether a conspiracy motivated by invidiously discriminatory intent other than racial bias would be actionable under the portion of § 1985(3) before us.

*Id.* at 102 n. 9, 91 S.Ct. at 1798, 29 L.Ed.2d at 348. Lower courts have, not surprisingly, approached this issue from more than one direction. Judge Merhige, in *Bellamy v. Mason's Stores, Inc.,* 368 F.Supp. 1025, 1028 (E.D. Va. 1973), aff'd, 508 F.2d 504 (4th Cir.1974), equates a § 1985(3) class with a class "defined by the traditional indicia of suspectness . . . discrete, insular and immutable characteristics." This interpretation would appear to limit the possible classes to those based on race, national origin, and, according to Judge Merhige, sex.[15] The Court of Appeals for

---

**15.** We note here our wholehearted agreement with Judge Gibbons that

> It must be acknowledged that the appropriate standard against which a disputed gender based classification should be measured . . . does not spring from the pages of

United States Reports with immediate clarity.

*Vorchheimer v. School District of Philadelphia,* 532 F.2d 880 (3d Cir.1976) (Gibbons, J. dissenting).

the Eighth Circuit, on the other hand, has expanded the class definition to include

> an identifiable body with which the particular plaintiff associated himself by some affirmative act. It need not be an oath of fealty; it need not be an initiation rite; but at least it must have an intellectual nexus which has somehow been communicated to, among and by the members of the group.

*Means v. Wilson,* 522 F.2d 833, 839–40 (8th Cir.1975), *cert. denied,* 434 U.S. 958, 96 S.Ct. 1436, 47 L.Ed.2d 364, 44 U.S.L.W. 3498 (Mar. 9, 1976), *quoting, Westberry v. Gilman Paper Co.,* 507 F.2d 206, 215 (5th Cir. 1975). As the Eighth Circuit notes, however, the Court of Appeals for the Fifth Circuit, en banc, withdrew the *Westberry* opinion, dismissing the case as moot "so that it will spawn no legal precedents." 507 F.2d at 216. In the present case, regardless of the direction from which we approach the problem, we cannot satisfactorily isolate from plaintiff's pleadings any discrete class. Although women as a class are mentioned in ¶ 25 of the complaint and single women in ¶ 16, the gravamen of plaintiffs' cause of action is that the restrictions which Blue Cross and Blue Shield place on benefits for normal pregnancies adversely affect all subscribers, men or women, married or unmarried, who wish maternity benefits by infringing on their religious exercise and on their right to bear children. Any attempt to locate a discrete class is confused by the facts that some parts of the complaint allege injury to all Blue Cross and Blue Shield subscribers, that two of the named plaintiffs are male, and that plaintiffs do not identify any particular religious group whose rights are threatened. In short, we find here no class definite enough to meet the test of *Griffin.*

[5] Plaintiff's only remotely colorable class theory, that women *as a class* are invidiously discriminated against because of a condition peculiar to their sex, was laid to rest (at least on a constitutional level) in *Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974). There the Court, in discussing the absence of class-based discrimination, stated:

> The California insurance program does not exclude anyone from benefit eligibility because of gender but merely removes one physical condition—pregnancy—from the list of compensable disabilities. While it is true that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is a sex-based classification like those considered in *Reed, supra [v. Reed,* 4104 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225] and *Frontiero, supra,* [v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583]. Normal pregnancy is an objectively identifiable physical condition with unique characteristics. Absent a showing that distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against members of one sex or the other, lawmakers are constitutionally free to include or exclude pregnancy from the coverage of legislation such as this on any reasonable basis, just as with respect to any other physical condition.

> The lack of identity between the excluded disability and gender as such under this insurance program becomes clear upon the most cursory analysis. The program divides potential recipients into two groups—pregnant women and nonpregnant persons. While the first group is exclusively female, the second includes members of both sexes. The fiscal and actuarial benefits of the program thus accrue to members of both sexes.

417 U.S. at 496–97 n. 20, 94 S.Ct. at 2492, 41 L.Ed.2d at 264. Given the obvious factual parallels, then, between this action and *Geduldig,* we believe we are precluded from considering the classifications here based on pregnancy as sex-based classifications.

Noting the language of the *Geduldig* Court that distinctions based on pregnancy are not class-based

> absent a showing that distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimina-

tion against members of one sex or the other,

brings us to the next fatal deficiency in plaintiffs' allegation of § 1985(3) jurisdiction. There is no explicit allegation that defendants Blue Cross or Blue Shield, in placing restrictions on coverage for normal pregnancy, acted with the requisite class-directed animus or hostile motive. Nor can we, even from the most liberal reading of the pleadings, infer such an allegation. As is evident from reading *Griffin*'s examination of the legislative history of § 1985(3), the Court found the element of class-directed animus a crucial limitation on the reach of the statute. After noting that the changes in § 1985(3) from original draft to final form were interpreted by the legislators responsible for drafting the statute as an attempt to emphasize the animus or motive required under the statute, the Court went on to say:

> The constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law can be avoided by giving full effect to the congressional purpose—by requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment.

403 U.S. at 102, 91 S.Ct. at 1798, 29 L.Ed.2d at 348. The Court then went on to say in a footnote:

> The motivation requirement introduced by the word "equal" into the portion of § 1985(3) before us must not be confused with the test of "specific intent to deprive a person of a federal right made definite by decision or other rule of law" articulated by the plurality opinion in *Screws v. United States,* [325 U.S. 91, 103, 65 S.Ct. 1031, 1036, 89 L.Ed. 1495] . . . for prosecutions under 18 U.S.C. § 242. Section 1985(3), unlike § 242, contains no specific requirement of "wilfulness." . . . The motivation aspect of § 1985(3) focuses not on scienter in relation to deprivation of rights but on invidiously discriminatory animus.

*Id.* at 102 n. 10, 91 S.Ct. at 1798, 29 L.Ed.2d at 348. In the pleadings filed in *Griffin,* the Court pointed out, plaintiffs alleged the requisite animus by stating that defendants deprived plaintiffs "of the equal enjoyment of legal rights *because of their race." Id.* at 103, 91 S.Ct. at 1799, 29 L.Ed.2d at 349 (emphasis added). Following *Griffin* lower courts have been careful to determine whether or not any claimed injury was inflicted allegedly because of a plaintiff's status as a member of a particular class. In *Hughes v. Ranger Fuel Corp.,* 467 F.2d 6, 10 (4th Cir. 1972), the Court of Appeals for the Fourth Circuit found no jurisdiction under § 1985(3) because

> There is no averment in the complaint that the defendants attacked the plaintiffs *because the latter were environmentalists* . . . . Theirs was a purely spontaneous act, not alleged to be a part of any general pattern of discriminatory action directed to any class.

(Emphasis added); *accord Arnold v. Tiffany,* 487 F.2d 216 (9th Cir. 1973), *cert. denied,* 415 U.S. 984, 94 S.Ct. 1578, 39 L.Ed.2d 881 (1974).

 Although courts will construe a complaint liberally to locate allegations of discriminatory animus, our most liberal construction of plaintiffs' complaint fails to reveal the necessary allegations. In *Richardson v. Miller,* 446 F.2d 1247, 1249 (3d Cir. 1971), the Court of Appeals for the Third Circuit, noting approvingly "the trend in recent decisions to 'accord [to the civil rights statutes] a sweep as broad as [their] language,'" found the following allegations sufficient statements of discriminatory intent:

> That the . . . discrimination arose because of plaintiff's . . . advocacy of constitutional and legal rights . . .; his opposition to the defendants' policy of hiring only gentile Caucasians.
> [F]urther, the defendants so conspired because they could not condone plaintiff's advocacy of racial equality and his opposition to the practice of racial intolerance and discrimination that existed within the corporate structure in *Greensburg.*

446 F.2d at 1248 n. 1. The court did say, however, that the issue of whether or not

these allegations were sufficient was close. If, indeed, *Richardson* was a close case, then the complaint in this action, lacking as it does any allegation of discriminatory animus or hostile motive, is clearly insufficient to allege a cause of action under § 1985(3).

In sum, having found no federal jurisdictional base for plaintiffs' cause of action, under either § 1983 or § 1985(e), we must dismiss plaintiffs' complaint.[16, 17]

16. Although plaintiffs do not make any such allegation in their complaint, they allege shortly and vaguely in one or more of their briefs the existence of a conspiracy between defendants and employers violative, apparently, of Title VII. Because plaintiffs have not at all defined the contours of this allegation, we will not consider it. Finally, because we find no federal jurisdiction here, we will not consider plaintiffs' claims under the Pennsylvania Constitution.

17. Just as we were about to issue this Memorandum and Order, we received a copy of the very recent decision of the Court of Appeals for the Third Circuit in *Broderick v. Associated Hospital Service of Philadelphia*, 536 F.2d 1 (3d Cir. 1976). In *Broderick* the Third Circuit affirmed a finding by Judge Cahn of this Court that the nexus between the Pennsylvania Insurance Department and certain enrollment practices of Blue Cross and Blue Shield which imposed restrictions on married women was not sufficiently close to transform the conduct of Blue Cross and Blue Shield into state action. Plaintiffs' principal difficulty both at the district and the circuit level appears to have been their studied refusal to heed Justice Rehnquist's admonition in *Jackson* that "detailed

inquiry may be required in order to determine whether the [state action] test is met." 419 U.S. at 351, 95 S.Ct. at 453, 42 L.Ed.2d at 484. Both courts relied on the barrenness of the record in dismissing the suit for lack of subject matter jurisdiction. Writing for two of the three-member panel on the circuit level, Judge Garth does emphasize, however, that a particular lack in the record is its failure to show that the enrollment practices complained of were ever presented to the Pennsylvania Insurance Department for approval. We do not believe that this finding necessarily implies that state approval of a certificate containing a printed statement of such practices would automatically convert the insurers into state actors. We note that Judge Garth would require, for a finding of state action, proof "that Pennsylvania has 'put its own weight' [Jackson at 357] on the side of the privately initiated enrollment practice." Under *Jackson*, as we read it, prior state approval of a certificate or contract of insurance containing objectionable provisions initiated by a private insurer, does not, without more, rise to the level of state action. Finally, we note our full agreement with Judge Seitz's concurring opinion.