Pamela MAGILL, a minor, by her parents and natural guardians, William L. Magill and Patricia Magill, Appellants,

v.

AVONWORTH BASEBALL CONFERENCE et al.

No. 73–1860.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) March 21, 1975.

Decided May 8, 1975.

**1330**

Stanley M. Stein, Feldstein, Bloom & Grinberg, Pittsburgh, Pa., for appellants.

William Sloan Webber, Pittsburgh, Pa., for Avonworth Baseball Conference.

Margaret E. Graue, Bernadine T. Harrity, Mary Ann Kirkpatrick Vitaro, Jean Witter, Law Students for amicus curiae—Duquesne Women's Law Student Association, Duquesne University School of Law, Pittsburgh, Pa.

Before ALDISERT, GIBBONS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

■ The question presented is whether the district court erred in denying relief to a ten-year-old girl who asserted an Equal Protection deprivation when a community youth baseball conference refused to allow her to participate.

Alleging that the defendant officers of the Avonworth Baseball Conference (ABC) refused to permit her to play baseball solely because of her sex and thus infringed rights secured by the Fourteenth Amendment, plaintiffs brought a Civil Rights Action [1] seeking preliminary and permanent injunctions. Following a hearing, the district court held (1) there was no state action, and (2) assuming state action, there was no unconstitutional discrimination. Plaintiffs have appealed.[2] We hold that state action was not present to confer jurisdiction and affirm without reaching the constitutional question.

On April 6, 1973, Pamela Magill, accompanied by her parents, went to a Ben Avon Heights school to enroll in ABC's 1973 summer baseball program. Her parents completed an application form in her name and paid the $7.00 registration fee. The following day, an ABC official told Mr. Magill that his daughter was unable to play because the program was limited to boys. Following consideration of Pamela's application by the ABC Board of Directors, ABC returned the registration fee, and appellants commenced this action.

ABC is a private, non-profit corporation chartered and organized under the laws of Pennsylvania. Its stated purpose is "[t]he promotion and encourage-

---

1. The action is brought under 42 U.S.C. §§ 1983 and 1985 with jurisdiction based upon 28 U.S.C. §§ 1343, 2201, and 2202. While the complaint contains class action allegations, it does not appear from the record that the district court made a class determination.

2. Plaintiffs' appeal was argued originally on March 11, 1974. In June 1974, Little League Baseball, Inc. announced it would permit female participation in its program. Retaining jurisdiction, we remanded the proceedings to the district court for a determination of mootness. The court found that ABC was not affiliated with Little League Baseball, Inc. and that it would not change its baseball program as a result of this announcement. It concluded, and we agree, that this action is not moot.

ment of the playing and enjoyment of baseball among school-age youngsters . . . ." ABC administers the baseball program for the geographical area encompassed essentially by the Avonworth School District. ABC is staffed by volunteers and owns no playing facilities.

■ At the outset, we dispose of any contention that Pamela, 10 years old at the time of the hearing in this action, was or is unable to seek an injunction against the entire ABC program, including divisions of that program provided for youngsters in other age groups.[3] Pamela, by her parents, attacks the entire practice by which ABC excludes females from its baseball program as it currently exists.[4] In this respect her challenge resembles that of the plaintiffs in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), where desegregation of an entire school system was sought, and not merely that of the grades in which the plaintiffs would have been included.

The threshold task before us is to determine the presence *vel non* of state action.[5]

### I.

Any discussion of the "protean concept"[6] of state action must begin with the Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883). It was there the Supreme Court first enunciated the principle that "[i]ndividual invasion of individual rights is not the subject-matter of the [Fourteenth] amendment"; only

"state action of a particular character . . . is prohibited." *Ibid.* at 11, 3 S.Ct. at 21.

■ Notwithstanding the *Civil Rights Cases,* subsequent decisions of the Supreme Court have pierced the seemingly impenetrable veil of private, individual conduct to find state action. These cases have the capability of being grouped into three general categories: (1) where state courts enforced an agreement affecting private parties; (2) where the state "significantly" involved itself with the private party; and (3) where there was private performance of a government function.[7]

An example of cases falling in the first category is Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), in which state action was premised upon state court enforcement of private, racially restrictive covenants against black purchasers of land.

■ Cases treated under the second category are quite varied; they run the gamut of possible state involvement in private conduct. Although one case, Public Utilities Commission v. Pollak, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952), indicated that the PUC's action in placing its *imprimatur* on allegedly objectionable conduct constituted state action, the Court's latest pronouncement in Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), held that Metropolitan's termination of its customer's electrical service did not constitute state action. In Reit-

---

**3.** The district court found that ABC operates a Minor League for youngsters aged 8 to 10; and a Little League for youngsters aged 11 to 13. ABC also sponsors Pony and Colt leagues for older youngsters. However, the evidence presented at the injunction hearing disclosed that the Minor League age group was 8 to 11 and the Little League age group was 9 to 12. This is not a crucial factual difference. Appellant turned 12 on March 7, 1975, and ABC establishes its league age as of July 31. Therefore, appellant is obviously eligible to play in ABC's Little League.

**4.** ABC president O'Brien testified that the baseball conference would be willing to spon-

sor a separate subdivision of girls in each league if sufficient interest were forthcoming.

**5.** A claim brought under § 1983 must prove acts "under color of state law." This provision has been treated as equivalent to the state action requirement of the Fourteenth Amendment. United States v. Price, 383 U.S. 787, 794–95 n.7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966).

**6.** Lewis, The Meaning of State Action, 60 Colum.L.Rev. 1083, 1085 (1960).

**7.** 19 Wayne L.Rev. 1309, 1310–12 (1973).

man v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), a California constitutional amendment which essentially authorized racial discrimination in the housing market provided the requisite state action. Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), held that the defendant municipal parking authority was a joint participant in the operation of a privately owned restaurant and that the restaurant's refusal to serve blacks was sufficiently imbued with state action to warrant application of the Equal Protection Clause of the Fourteenth Amendment. However, Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), and Jackson v. Metropolitan Edison Co., *supra*, make clear that pervasive state regulation, without more, is insufficient to constitute state action.

Exemplary of cases in the third category is Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953), in which the Court struck down the private, all-white Jaybird Party's candidate selection process which excluded blacks from participation. The Court reasoned that the Party's primary was the only effective part of the electoral process which determined who would rule and govern a county. Although the state did not control the Jaybird primary, it did permit its use in the electoral process; this, in turn, produced an election that offended constitutional restrictions.

With respect to the case *sub judice*, we are not concerned with the first and third categories. This is not a situation where state courts have enforced an agreement affecting private parties; nor can it be said that the implicated conduct, operation of a youth baseball league, constitutes private performance of a function traditionally associated with sovereignty. Perforce, our attention must focus on significant state involvement with the particular conduct of the private party, here ABC.

█ It would seem that we now have only to cull a clearcut definition of state action from relevant decisions dealing with this particular concept of state action. However, the Supreme Court's studied avoidance of any definitive state action formula can hardly be gainsaid. The Court admits to extreme difficulty in articulating an all-inclusive test [8] and seems to emphasize that, within the confines of certain guidelines, the presence or absence of state action must be determined on a case-by-case basis.[9] However, we do know that the polestar of our analysis must be whether the state involvement in the challenged action is "significant." Reitman v. Mulkey, *supra*, 387 U.S. at 380, 87 S.Ct. 1627. Stated otherwise, "the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action . . . so that the action of the latter may be fairly treated as that of the State itself." Jackson v. Metropolitan Edison Co., *supra*, 419 U.S. at 351, 95 S.Ct. at 453. Because a nexus test is necessarily one of degree, we must conduct a detailed inquiry into, and a thorough sifting of, the record facts.

With this in mind we turn to the factual complex presented to the district court.

## II.

ABC uses four publicly owned baseball fields in operating its two leagues. One field, Avonworth Community Park, is operated and maintained by the Avon-

---

**8.** This Court has never attempted the "impossible task" of formulating an infallible test for determining whether the State "in any of its manifestations" has become significantly involved in private discriminations. Reitman v. Mulkey, *supra*, 387 U.S. at 378, 87 S.Ct. 1627.

**9.** [T]he question of whether particular discriminatory conduct is private, on the one hand, or amounts to "state action," . . . frequently admits of no easy answer. "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." Burton v. Wilmington Parking Authority, . . . [365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961)]. Moose Lodge No. 107 v. Irvis, *supra*, 407 U.S. at 172, 92 S.Ct. at 1971.

worth Community Organization for Recreational Development (ACORD), a non-profit, unincorporated, volunteer organization, whose members are appointed by officers of the five municipalities in the Avonworth School District (Boroughs of Ben Avon, Ben Avon Heights and Emsworth; Kilbuck Township and Ohio Township). ACORD collects fees for the use of the baseball fields, picnic facilities, swimming pool and dance hall situated in the Park. Over a period of years, ACORD reduced the fees it charged ABC in deference to ABC's strained financial situation. Although ABC had been charged $25.00 for the previous season, no fee was assessed for the 1973 baseball season.

The remaining three fields are made available to ABC through the permission of the Borough of Ben Avon Heights, the Avonworth School Board and Ohio Township. The baseball conference pays no fees for the use of these public facilities. None of the four park facilities is used exclusively by the ABC. The Avonworth School Board also permits ABC to use the school facilities both for its advertising and for its annual organizational meeting, at which registration for the baseball conference's program takes place.

At the hearing below, ABC president, Ellis J. O'Brien, was asked to what extent his organization relied upon public facilities. He replied:

It would be absolutely impossible for us to play on facilities we personally own, consequently, we must depend upon public facilities upon which to play.

It thus becomes clear that ABC could not operate without the use of public facilities.

It can be argued that this is a crucial fact in the state action equation: By allowing ABC to use parks and school facilities, the municipal authorities pump vital life-blood into ABC's organizational veins. Therefore, the state, through its municipal subdivisions, supplies the public means to accomplish the offensive, private objective.

However, we are instructed in Gilmore v. City of Montgomery, 417 U.S. 556, 573-74, 94 S.Ct. 2416, 2426, 41 L.Ed.2d 304 (1974), that *mere use* of a public park by a private organization does not satisfy the state action nexus test:

"The Court has never held, of course, that discrimination by an otherwise private entity would be violative of the Equal Protection Clause if the private entity receives any sort of benefit or service at all from the State, or if it is subject to state regulation in any degree whatever." [Moose Lodge No. 107 v. Irvis,] 407 U.S., at 173 [92 S.Ct., at 1971]. Traditional state monopolies, such as electricity, water, and police and fire protection—all generalized governmental services—do not by their mere provision constitute a showing of state involvement in invidious discrimination. Norwood v. Harrison, 413 U.S. [455], at 465 [93 S.Ct. 2804 at 2810, 37 L.Ed.2d 723]; Moose Lodge No. 107 v. Irvis, 407 U.S., at 173 [92 S.Ct., at 1971]. The same is true of a broad spectrum of municipal recreational facilities: parks, playgrounds, athletic facilities, amphitheaters, museums, zoos, and the like. *Cf.* Evans v. Newton, 382 U.S. [296], at 302 [86 S.Ct. 486, at 490, 15 L.Ed.2d 373].

Because mere ownership and use of the ballfields are not dispositive, we turn our analysis to an evaluation of the support given to ABC by the state. We first consider the nature of the state aid provided. We recognize that virtually every citizen and private organization is dependent upon the state for certain services upon which the state has an effective monopoly, such as police and fire protection, and perhaps electricity, water, and sewage service. However, this dependence alone does not convert the activities of the individuals or of the private organizations using such services into state action. In most communities, municipalities furnish park facilities to the public at large and have an effective "operating monopoly" on park land suitable for baseball games. *See* Norwood

v. Harrison, *supra,* 413 U.S. at 465, 93 S.Ct. 2804. Individuals are often unable to participate in athletic events and other recreational activities—picnics, barbeques, and large family reunions—unless municipally-owned park lands are used.

 It is under these circumstances that the spectrum of the Fourteenth Amendment must be viewed. The focus of the amendment must not subsume every private use of a public facility under the aegis of state action. It is neither the intention of § 1983 nor the purpose of the Fourteenth Amendment to circumscribe totally the individual liberties and freedoms of the private sector. Otherwise, in the context of the case *sub judice,* private groups whose membership requirements would not pass the muster required of government institutions would be prohibited from merely using public parks. If such were the rule, a case could therefore be made prohibiting use of public parks by the University of Pittsburgh Student Black Action Society, a Catholic Church Sodality, The Ladies Hadassah, The Order Italian Sons and Daughters of America, or The Friendly Sons of St. Patrick. A large sector of the community could thus be denied the use of public facilities for privately-organized activities. So viewed, the state action concept would be improvidently expanded, freedom of activity would be seriously and severely curtailed, and the very real purpose of the Civil Rights Act would be thwarted. "[C]ourts should pay heed, in testing for government action, to the 'value of preserving a private sector free from the constitutional requirements applicable to government institutions.' [Wahba v. New York University, 492 F.2d 96, 102 (2d Cir. 1974)]." Jackson v. Statler Foundation, 496 F.2d 623, 639 (2d Cir. 1974) (Friendly, J., dissenting from the denial of in banc consideration).

 We have also considered the financial value of state assistance. Here plaintiffs did not establish any financial loss to the municipalities occasioned by supplying the playing fields for ABC use. Rather, the record indicates that ABC contributed $120 to $200 in materials, in addition to its own labor, in repairing one of the fields to make it more playable. There was no showing of a marked deterioration of the fields or that ABC's scheduled use was so frequent as to oust general public use. The record indicates only that ACORD reduced ABC's use fee. It had been charged $25.00 for the previous season, but no charge was made during the current season because ACORD believed that ABC could not afford the fee. We believe that the waiver of this fee is *de minimis,* and deserving of only slight weight in the state action equation. Unlike the aid in Norwood v. Harrison, *supra,* these circumstances had no "significant tendency to facilitate, reinforce, and support private discrimination." *Ibid.* at 466, 93 S.Ct. at 2811.

 We have also considered the proportion of the organization's needs supplied by the municipalities.[10] Although ABC's annual financial budget ranged between $2,800 and $3,000, this does not tell the whole story. These figures did not include the value of voluntary manpower, including free coaching and free managerial services. While ACORD and the three other municipalities supplied the four fields, ABC itself supplied supervision, planning, coaching, equipment, travel, and a governing board. Unlike Fortin v. Darlington Little League, Inc., 514 F.2d 344 (1st Cir. 1975), there was no evidence that the municipalities laid out baseball diamonds to ABC specifications, that the public facilities were primarily for the benefit of ABC, and that the general public was often precluded from using the facilities. *See* detailed

---

**10.** We are mindful that:

> [d]ecisions on the constitutionality of state involvement in private discrimination do not turn on whether the state aid adds up to 51 percent or adds up to only 49 percent of the support of the segregated institution.

Norwood v. Harrison, *supra,* 413 U.S. at 466, 93 S.Ct. at 2811, quoting Poindexter v. Louisiana Financial Assistance Commission, 275 F.Supp. 833, 854 (E.D.La.1967), aff'd, 389 U.S. 571, 88 S.Ct. 693, 19 L.Ed.2d 780 (1968).

discussion in the district court opinion, 376 F.Supp. 473, 478 (D.R.I.1974).

■ An analysis of the nature, value and proportion of state aid to ABC does not end our inquiry, for it is entirely possible that the state could be significantly involved in one aspect of a private organization while it is insignificantly involved in a different aspect of that organization. It is for this reason that we must narrow our state action inquiry to state involvement in ABC's policy of excluding persons of the female gender.

Plaintiffs' evidence did not establish that the program was represented as being sponsored by the municipalities, or as supplementing a municipal baseball program as in Fortin v. Darlington Little League, Inc., *supra.* Indeed, a contrary impression was created: that ABC was a volunteer, private organization designed to furnish an athletic program for residents of the area not on behalf of the municipal governments. This activity may be contrasted with athletic leagues sponsored by official recreation departments of the City of Pittsburgh, the County of Allegheny, or political subdivisions in major metropolitan areas.

Additionally, there was no proof that any of the municipal officers participated in the decisional process setting forth rules of gender classification in ABC, the precise "challenged activity". Grossner v. Trustees of Columbia University, 287 F.Supp. 535 (S.D.N.Y.1968), seems especially pertinent in this regard. There a disciplinary proceeding was the subject of the action against Columbia University, a private organization receiving substantial federal funding. Refusing to find state action on the record as then presented, Judge Marvin Frankel emphasized that "receipt of money from the State is not, without a good deal more, enough to make the recipient an agency or instrumentality of the Government," *ibid.* at 547–48, and that plaintiffs "show nothing approximating the requisite degree of 'state participation and involvement' in *any* of the University's activities, let alone the specific [disciplinary] proceedings in question here." *Ibid.* at 549.

Appellants mount the argument that ABC was more than a mere user of the fields; it received permission to use the fields on specified dates.

We are mindful that when a "governmental entity rations otherwise freely accessible recreational facilities, the case for state action will naturally be stronger . . . ." Gilmore v. City of Montgomery, *supra*, 417 U.S. at 574, 94 S.Ct. at 2426. Yet, we do not believe that the state action line has been crossed here. There is no evidence that ABC received preferential treatment at the expense of nondiscriminating organizations. Indeed, there was no evidence demonstrating excessive demand for the use of any of the fields. ABC was not the exclusive user; the fields were open to and used by the public generally. There is no evidence that the state attempted to regulate ABC's baseball games, either as to the rules of the game or the selection of players. In sum, we fail to see how the scheduling of certain dates significantly involved the state in ABC's gender policy.

■ Finally, appellants stress that ABC held its registration at a Ben Avon school and that ABC-furnished advertisements were placed on school property. We do not believe that these facts tip the balance in favor of significant state involvement in the challenged activity. Although ABC used the facilities of one school for a one-evening registration period, there was testimony that school buildings were used by the Ben Avon Kiwanis and frequently by Penn State University and the Community College. ABC's President testified that advertisements were placed in the schools as an efficient way of informing prospective applicants. There is no testimony that permitting such advertising and building use was other than a common community courtesy extended to all persons within the district. There is lacking, therefore, a sufficient nexus between the state and ABC's gender-based policy.

■ In sum, we are presented with a factual complex in which ABC is granted the non-exclusive, scheduled use of four

public fields. School buildings are used only as a convenient location for ABC's registration and advertisement efforts. No state participation exists either in the operation of ABC as a whole or in its gender-based classification in particular. After weighing and sifting presented facts, and after considering them as a whole, we conclude that plaintiffs have failed to meet their burden of demonstrating that the state is significantly involved in ABC's gender-based discrimination. The factual nexus between the state and ABC's allegedly offensive policy is not sufficiently close so that ABC's action may be fairly treated as that of the state itself.

The judgment of the district court will be affirmed.