Louis DUVA, Tony Ayala, Jr., and Tony Ayala, Sr., Plaintiffs,

v.

WORLD BOXING ASSOCIATION, Defendant.

Civ. A. No. 82–672.

United States District Court, D. New Jersey.

April 20, 1982.

Cerreto & LaPenna by Michael A. Cerreto, Newark, N. J., and James S. Marotta, Totowa, N. J., for plaintiffs.

James J. Binns, P.A. by James J. Binns, and Hope C. Lefeber, Philadelphia, Pa., for defendant World Boxing Assn.

Normal Fischbein, Newark, N. J., for intervenor Bob Arum Enterprises.

STERN, District Judge.

Tony Ayala, Jr. is a prize fighter. He is currently the third-ranked junior middleweight in the world according to the rankings of the World Boxing Association ("WBA"). He and his managers, Louis Duva and Tony Ayala, Sr., bring this action against the WBA, challenging the lawfulness of a WBA-sanctioned championship fight scheduled for April 24, 1982 which pits the WBA's fourth-ranked junior middleweight contender, Charlie Weir, against the current WBA junior middleweight champion, Davey Moore.

Plaintiffs allege that the prospective fight is unlawful because the WBA has, in effect, stripped Ayala of his third-place ranking by enabling Weir to elbow his way past Ayala in the line of boxers waiting for the opportunity to challenge the champion. Plaintiffs contend that the WBA's sanction

of this fight, done in violation of the WBA's own charter, has deprived Ayala of a property interest without due process of law. Plaintiffs further contend that the WBA has improperly sanctioned the Moore-Weir bout solely to cater to the pecuniary advantage of a fight promoter who seeks to capitalize financially on the occasion of the opening of a new 80,000-seat stadium in Johannesburg, South Africa by bringing a black champion, Moore, to fight a white South African, Weir.[1]

The WBA responds by alleging that its actions have at all times been prompted by the "best interests" of boxing. The WBA admits that Ayala is ranked higher than Weir and that Regulation 6 of its World Championships Regulations requires champion Moore to defend against "the leading available contender." The WBA contends, however, that Regulation 19 of those same regulations permits it to suspend any or all of the other rules in its discretion, and that it chooses to suspend Regulation 6 in order to permit Moore to fight Weir for the championship. Alternatively, the WBA argues that "the leading available contender rule" only protects the right of the first-ranked challenger to fight the champion and that since the number one contender, Ayub Kalule, has relinquished that right to the promoter of the Moore-Weir contest, Ayala is not injured and has no standing to be heard.

The promoter of the South African fight, Bob Arum Enterprises ("Intervenor Arum"), moved for and was granted the right to intervene in this action. It is Intervenor Arum's position that whether or not Regulation 6 confers a property right on Ayala is immaterial. Intervenor Arum argues that the WBA may and should suspend its rules to enable this fight to take place because the public wants it. He contends that if the WBA were forced to follow Regulation 6, and its fighters given their turn at the championship in the order of their earned rankings, the public would

1. Aff. of Robert Arum, Mar. 19, 1982, ¶ 11; Statement of Michael A. Cerreto, Tr. of Mar. 31, 1982 at 70.

be denied the opportunity to see those contests which it wished, when it wished, between the fighters of its choice.

Intervenor Arum claims that he knows what the public wants—namely, that the next championship fight take place between Weir and Moore in South Africa—and that even though the WBA's sanction means that Weir will be leapfrogging over Ayala's place in line for the championship, the WBA may suspend its rules so that this particular fight may be made possible and the public accommodated.

For the reasons that follow, this Court determines that plaintiff Tony Ayala, Jr. has a property right in his WBA ranking and in the procedures established by Regulation 6. We also hold that the WBA, which awarded him that ranking after Ayala repeatedly fought under its auspices, is an authority which exercises governmental power, and that the WBA may not summarily or arbitrarily wield that power to deprive Ayala of his property rights. Under the facts of this case, we find that the WBA's invocation of Regulation 19—in part through a body constituted in violation of its By-laws—without a proper hearing, without any statement of the reasons for its decision and only after the Moore-Weir fight was already in place *and the plaintiffs had appealed to this Court for relief,* was arbitrary, capricious and a violation of Ayala's due process rights.

The Court will therefore enter an injunction prohibiting the WBA from sanctioning the Moore-Weir fight as a championship fight.

## FACTS

The WBA is an incorporated association of national, state and local boxing regulatory authorities established "to ensure greater efficiency and uniformity in the supervision of professional boxing, to obtain more effective control, to regulate professional boxing, ... to encourage and assist professional boxing throughout the world [and to] encourage and inspire greater public appreciation of boxing as an international sport and as a builder of the athlete's character and body." WBA Constitution, Art. II. Regular membership in the WBA, the only category of membership by which members may exercise a vote, is limited to organizations which can demonstrate that they are "legally organized to regulate, control and/or supervise professional boxing in a country or in any of its political or territorial subdivisions." *Id.*[2] In addition, with the exception of the International Commissioner, all WBA officers and committee chairmen *must* be "members in any official capacity of a National, State, Provincial or Municipal Boxing Authority." WBA Constitution, Art. IV.[3]

WBA world championship fights are governed by its World Championships Regulations,[4] which are enforced by the World Championships Committee.[5] The regulations reflect the WBA's determination to

2. Anyone who has been issued a license by a regular member of the WBA is an Associate Member of the organization. *Id.* This category includes the plaintiffs in this action.

3. The officers of the WBA consist of a President, currently Rodrigo C. Sanchez E. of Panama, four vice-presidents, four regional vice-presidents, an International Coordinator, an International Commissioner, a Treasurer, an Executive Secretary, a Legal Advisor, a Medical Advisor, an Administrative Advisor and four additional members. *Id.* The Executive Committee of the WBA consists of the above named officers, along with the Chairman of the Ratings Committee and the Chairman of the World Championships Committee, currently Luis Batista Salas of Puerto Rico.

4. While the Constitution, By-laws and Regulations of the WBA are normally superseded by an inconsistent national, state or local law, the World Championships Regulations are "obligatory and binding in all World Boxing Association sanctioned fights and shall prevail over local rules and regulations." WBA Constitution, Art. VIII.

5. The World Championships Committee consists of its President, Luis Batista Salas, WBA President Sanchez, International Commissioner Greene, H. O. Klopper of South Africa, Melvin Ziegler of Florida, Murray Sleep of Canada and Jung Kyu Yang of Korea.

assume "firm, intelligent and objectively administered control of the World Championships of boxing insofar as these and their holders shall be recognized within the territory of its members." World Championships Regulations, Preamble, ¶ 2. The regulations also reflect the WBA's view that a world championship

"is not the personal property of any boxer [but] is and must be a trusteeship, subject to the terms of a trust hereinafter for the first time fully defined, for the use and benefit of all those boxers and followers of boxing who by their contributions of time, effort, risk and resources sustain the profession in existence."

*Id.* ¶¶ 3, 4.

Championships Regulation 6 provides, in pertinent part, that:

"should the World Champion lose his title against an opponent other than the leading available contender, the new World Champion shall be required to make his first title defense against the leading available contender, on his weight class in accordance with the current rating list of the Association, within a period of ninety (90) days after the acquisition of this title thereafter throughout the Champion's reign as World Champion he shall defend his championship within intervals of no more than six (6) months against the leading available contender in his weight class in accordance with the current rating list of the Association."

The leading available contender is determined by reference to the current rating list promulgated by the WBA's Ratings Committee.[6]

Championships Regulation 19 provides that "any exception to these World Championships Regulations must be approved by a two-thirds vote of the Championships Committee, approved by the President and approved by a majority vote of the Executive Committee."

On February 2, 1982, Davey Moore, having fought only eight professional fights and having entered the WBA Junior Middleweight rankings shortly before at Number Ten, defeated Tadashi Mihara for the Junior Middleweight title. There is no dispute that under Regulation 6 Moore thereupon became obligated to defend his title against "the leading available contender" in the Junior Middleweight Division by May 2, 1982.[7]

On February 3, 1982, plaintiff Duva informed WBA President Sanchez that Ayala, who has been ranked Number Three at all times relevant to this litigation, was available to fight Moore for the title.

Prior to the Moore-Mihara fight, however, Intervenor Arum had negotiated a contract between Moore and Weir, who was ranked Number Six at the time and is currently ranked Number Four, providing that should Moore defeat Mihara, his first title defense would be against Weir, in South Africa, on April 24, 1982. In December 1981, WBA President Sanchez "approved" this arrangement.[8] All parties agree that the Moore-Weir fight, expected to draw 80,000 people to a new stadium in Johannesburg, will be financially beneficial to Moore,

---

**6.** The WBA Constitution provides that the WBA shall:

"establish its ratings in each weight category or division, indicating in them up to ten boxers in each division, all such boxers being designated as outstanding contenders in each one of the above mentioned categories or divisions. These ratings shall be made available to Members of the World Boxing Association, to other boxing authorities, to the public in general, to the news media and to all interested parties."

WBA Constitution, Art. II.

**7.** *See, e.g.,* Aff. of Robert Arum, Mar. 19, 1982, ¶ 9.

**8.** The WBA and Intervenor Arum originally took the position that Sanchez had sanctioned the Moore-Weir fight before the commencement of this litigation. Statement of Norman Fischbein, Tr. of Mar. 8, 1982 at 22; Statements of James J. Binns and Robert Arum, Tr. of Mar. 31, 1982 at 36; WBA's Memorandum in Support of Dismissal of Application for Preliminary Injunction ("WBA Mem.") at 1. At his deposition, however, Sanchez stated that he had no power to sanction, or "approve," a fight, and that he had in December merely given his opinion that the WBA would sanction the fight. Dep. of Rodrigo Sanchez at 4, 17–18.

Weir and Intervenor Arum.[9] In addition, since the WBA receives a percentage of the purse from each fight it sanctions,[10] the fight will also be of particular financial benefit to the WBA.

At the time of the Moore-Mihara fight, Ayub Kalule was ranked Number One and Carlos Herrera was ranked Number Two.[11] Kalule filed a protest with the WBA, based on Regulation 6, against the sanction of the Moore-Weir fight, contending that Regulation 6 required Moore to fight him rather than Weir. On March 16, 1982,[12] after negotiations with Intervenor Arum, Kalule withdrew his protest on the representations that the winner of the Moore-Weir fight would fight him within 60 days and that his acquiescence in the Moore-Weir fight would benefit him financially.[13] He has signed a contract with Intervenor Arum to meet the Moore-Weir winner in June 1982.

In a letter dated February 8, 1982,[14] Championships Committee President Salas informed WBA President Sanchez that he had "ordered the new champion, Moore, to defend his title against Richard Weird [sic] and, sixty days after said fight, against Ayub Kalule." [15] Salas noted that the situation was a "legally interesting" one, since the Moore/Weir/Kalule contracts involved a "kind of arrangement [which] is not acceptable for the World Championships Committee, unless all affected parties agree." [16] In his view, however, the sanctioning of the Moore-Weir fight did not violate Regulation 6, since Kalule, whom Salas considered the

only "affected party," had agreed to the WBA's sanction of the fight.[17]

On March 4, 1982, plaintiffs filed this suit, contending that the Moore-Weir fight violated Regulation 6. On March 9, 1982, the day after a hearing on the plaintiff's application for temporary injunctive relief was postponed at the request of the defendant and Intervenor Arum, the WBA began to take steps apparently designed to utilize Regulation 19 to suspend Regulation 6 and waive any violation of it which may have occurred. Salas, President of the World Championships Committee, sent a telegram to all committee members which stated that:

> "President Rodrigo Sanchez agreed to let former champion Mihara fight David Moore and the winner to fight Charlie Weird [sic]. Leading available contender Kalule agreed to wait until that fight. This is the same arrangement given to Leonard in order to fight Kalule. I'm asking a vote from the championship committee to ratify decision taken by Rodrigo Sanchez.
>
> "If you don't answer in five days we will accept your vote in favor of ratification." [18]

One member of the Championships Committee, Greene, informed Salas that he objected to the ratification, and suggested that the matter "be held in abeyance until the Executive Committee meeting on March

---

9. Aff. of Robert Arum, Mar. 19, 1982, ¶¶ 11, 18; Aff. of Shelley Finkel, Apr. 5, 1982, ¶ 5.

10. Statement of James J. Binns, Tr. of Mar. 31, 1982 at 45.

11. The record does not indicate what position, if any, Herrera, as the second-ranked contender, has taken with respect to the scheduled Moore-Weir bout, or whether he is "available" to fight the champion.

12. WBA Mem. at 2.

13. Aff. of Mogens Palle, ¶¶ 10–11; Aff. of Robert Arum, Mar. 19, 1982, ¶ 12.

14. Sanchez has stated that he received this letter in March 1982. Dep. of Rodrigo Sanchez at 18–19.

15. Dep. of Rodrigo Sanchez, Ex. P–2. It is unclear under what authority Salas could, at this time, have "ordered" Moore to fight Weir.

16. *Id.* at 2–3.

17. *Id.* at 3.

18. Dep. of Rodrigo Sanchez, Ex. P–2. This voting procedure was in violation of Championships Regulation 3, which states that:

> "[w]hen a vote is taken by telephone, telegraph or by mail, a majority vote of the entire committee shall be required for a decision, and such vote shall be confirmed in writing forthwith by such voting member."

27."[19] Another member of the Committee, Sleep, responded that he was unable to vote on the matter until he had reviewed the matter with the other members of the Committee,[20] while a third member, Ziegler, informed Salas that he could not vote since he had not received a copy of the telegram.[21]

On March 27, 1982, the Championships Committee and Executive Committee met in St. Maartin. The Championships Committee, with Greene absent, voted 6–0 to approve a sanction of the Moore-Weir fight. Neither plaintiffs nor their attorney was present at this meeting, nor is there any evidence that they were invited to attend. No reasons were given by the Championships Committee for its decision; in fact, the record is unclear as to whether there was any discussion of the vote.[22] Later on March 27, the Executive Committee approved a sanction of the Moore-Weir fight by a 14–3 vote. Plaintiffs' attorney, Michael A. Cerreto, Esquire, addressed the Executive Committee for 15 minutes prior to the vote. Again, the record indicates that no reasons were articulated for the Executive Committee's action. President Sanchez also gave his approval to the Moore-Weir sanction on March 27.[23] No reasons were given by Sanchez for his decision.

## DISCUSSION

In order to successfully assert a claim that the WBA's actions have deprived them of property without due process of law, the plaintiffs must show, first, that the actions of the WBA are governmental actions to which the limitations of the Fourteenth Amendment apply, second, that plaintiffs possess a property interest to which due process protection is properly afforded, and, third, that the WBA has deprived them of this property without due process. Plaintiffs have satisfied all three criteria.

## STATE ACTION

The Due Process Clause of the Fourteenth Amendment applies only to action which "may fairly be said to be that of the states." *Shelley v. Kraemer,* 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948). The WBA's status as a voluntary, non-profit association does not, however, determine the state action issue, since the courts must, in an appropriate case, "pierce the seemingly impenetrable veil of private, individual conduct to find state action." *Magill v. Avonworth Baseball Conference,* 516 F.2d 1328, 1331 (3d Cir. 1975). As outlined in *Magill,* there are three categories of cases in which seemingly private action has been held to be in fact clothed with the mantle of the state: "(1) where state courts enforced an agreement affecting private parties; (2) where the state 'significantly' involved itself with the private party; and (3) where there was private performance of a government function." *Id.* While the first ground is inapplicable here, the facts summarized above clearly demonstrate that, when the characteristics of the members of the WBA rather than the organization itself, are examined, the action of the WBA can be considered state action under either of the latter two tests.

**19.** Ex. B to Aff. of Shelley Finkel, Mar. 29, 1982.

**20.** Dep. of Murray Sleep at 6; Dep. of Rodrigo Sanchez at 30.

**21.** Dep. of Melvin Ziegler at 6–7; Dep. of Rodrigo Sanchez at 30. Despite the fact that, prior to March 26, only four members of the Championships Committee had voted to ratify Sanchez's decision, Dep. of Rodrigo Sanchez at 52, the WBA contended, in a memorandum filed with this Court on March 24, that the Moore-Weir fight "was approved by a two-thirds vote of the Championships Committee." WBA Mem. at 7. Robert Arum, president of Intervenor Arum, stated in an affidavit dated

March 19 that "[i]t is my understanding that the Moore/Weir/Kalule arrangement has been approved by a two-thirds vote of the Championships Committee. . . ." Aff. of Robert Arum, Mar. 19, 1982, ¶ 14.

**22.** Dep. of Rodrigo Sanchez at 22; Dep. of Murray Sleep at 18; Dep. of Melvin Ziegler at 8.

**23.** There is conflicting testimony as to whether this approval came before or after the Championships Committee vote. Dep. of Rodrigo Sanchez at 40; Dep. of Melvin Ziegler at 8; Aff. of Robert Arum, Apr. 12, 1982, ¶ 17.

With respect to the third test set forth in *Magill*, the WBA clearly performs a public function. The regulation of boxing has long been a state or municipal activity; in New Jersey, for example, sole direction, management, control and supervision over all boxing exhibitions has, since 1931, been vested in the state athletic commissioner, who has the power to appoint inspectors and referees, license promoters, make and enforce any necessary regulations, determine which fights may be decision or title fights, and so forth. N.J.S.A. §§ 5:2–1 *et seq.* The pervasive governmental regulation of boxing reflects the state's substantial interest in strictly controlling an activity which involves the deliberate infliction of potentially serious injury on its participants.

All of the regular, voting members of the WBA, by definition, are governmental bodies with the power to regulate, control or supervise boxing in a particular jurisdiction. Twenty-six of these members have such powers within the jurisdiction of the United States. In addition, all officers of the WBA must, with one exception, be officials of a member governmental authority. At least five of these officers are affiliated with boxing authorities in the United States. The governmental bodies which constitute the WBA have delegated a considerable amount of their authority to the Association. For example, they are required to enforce any decision taken by the Association, WBA Constitution, Art. III, and any of their decisions may be appealed to the Grievances and Appeals Committee of the WBA. *Id.* Art. II. In addition, while they generally need not comply with WBA regulations which are inconsistent with the law of their jurisdiction, they must follow all rules pertaining to world championship fights. *Id.* Art. III. In return, the WBA is required to recognize, publicize and enforce any decision taken by one of its regular members within the scope of its authority. *Id.* Art. II.

Where, as here, a public function is carried out by an organization composed exclusively of governmental bodies, the presence of state action cannot be disputed.[24]

The same considerations which lead to the conclusion that the WBA performs a governmental function also dictate a finding that the state has "significantly involved" itself with the WBA under *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). The question of whether the actions of a voluntary athletic association composed, at least in part, of state organizations can be seen as the action of those organizations has been dealt with in numerous cases involving the National Collegiate Athletic Association, an organization whose membership is split roughly equally between public and private institutions. The Circuit Courts are unanimous in holding that the activities of the NCAA constitute state action. *Shelton v. NCAA,* 539 F.2d 1197 (9th Cir. 1976); *Howard Univ. v. NCAA,* 510 F.2d 213 (D.C. Cir.1975); *Parish v. NCAA,* 506 F.2d 1028 (5th Cir. 1975); *Associated Students, Inc. v. NCAA,* 493 F.2d 1251 (9th Cir. 1974); *cf. Wiley v. NCAA,* 612 F.2d 473 (10th Cir. 1979), *cert. denied,* 446 U.S. 943, 100 S.Ct. 2168, 64 L.Ed.2d 798 (1980) (majority does not reach the state action question; two dissenting opinions would find the NCAA's activities to be state action); *Rivas Tenorio v. Liga Atletica Interuniversitaria,* 554 F.2d 492 (1st Cir. 1977) (activities of defendant L.A.I., a Puerto Rican equivalent of the NCAA with thirty percent public school membership, are state action). Where, as here, the membership of an athletic association consists *solely* of public bodies, the state action question is even clearer; as one court has stated, "[i]f the NCAA was [sic] composed solely of public institutions, clear-

---

24. In fact, Intervenor Arum, with a passing reference to *McDonald v. NCAA,* 370 F.Supp. 625 (E.D.Cal.1974), a case which has been effectively overruled by *Associated Students, Inc. v. NCAA,* 493 F.2d 1251 (9th Cir. 1974), argues only that the Court need not reach the state action question. Similarly, defendant, without contesting the presence of state action here, argues that the Constitutional claim has not been sufficiently pled. The amended complaint filed in this action on April 20, 1982 properly asserts the due process claim.

ly state action would be present." *Howard Univ. v. NCAA, supra,* 510 F.2d at 220. These precedents, when applied to the role that public bodies play in the efforts of the WBA, leave little doubt that the WBA's actions constitute state action under the "significant involvement," or "entanglement" test of state action.

We hold therefore, that the Due Process Clause of the Fourteenth Amendment fully applies to the actions of the WBA. To hold otherwise would be to adopt the "strange doctrine ... that the states could avoid the restrictions placed upon them by the Constitution by banding together to form or to support a 'private' organization to which they have relinquished some portion of their governmental control." *Parish v. NCAA, supra* 506 F.2d at 1033.

## PLAINTIFFS' PROPERTY INTEREST

█ In order to make out a claim of denial of due process under the Fourteenth Amendment, one must prove that he was unjustly deprived of a protected liberty or property interest. Plaintiff Ayala, the third-ranked junior middleweight boxer, contends that the protected interest of which he has been deprived is a property right to have the opportunity, in accordance with the regulations of the WBA, to compete for the World Championship before that opportunity is afforded to the fourth-ranked contender, Charlie Weir.

An analysis of whether plaintiff has such a protectible property interest must begin with the Supreme Court's decision in *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). There the Court stated:

> "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. . . .
>
> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent

source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. . . ."

In this case, plaintiffs point to two sources of their property interest: Ayala's ranking by the WBA as the third-ranked contender and Regulation 6 of the WBA World Championships Regulations, which ensures that a champion in Davey Moore's position will fight "the leading available contender" within ninety days. Plaintiffs argue that that regulation guarantees that the third-ranked contender will be offered the opportunity to fight the champion *before* that opportunity is given to anyone ranked lower than Number Three.

There is no question that a professional boxer like Ayala is entitled to rely on his ranking and on the benefits that go with it under the WBA Regulations. Nothing can obscure the fact that Ayala's position as the third-ranked fighter in his weight class was earned only after a grueling struggle. No court can be oblivious to the kind of day in and day out punishment to which boxers subject themselves in order to become champions. Demonstrating the most demanding kind of physical discipline, they literally pound away, at great physical danger, in a single-minded effort to move up in the rankings. The WBA's ranking of plaintiff as the Number Three contender is its recognition of his dedication and success in advancing within the ranks. In the truest sense, Ayala has earned his ranking by sweat and blood.

Regulation 6 of the WBA Regulations is a means of guaranteeing that the ranking that a fighter has struggled to achieve means something. Regulation 6 is the WBA's commitment to the athletes it oversees that the road to the top will be fair; that, under the circumstances under which Moore holds his title, mandatory title defenses will go to fighters in the order in which they are ranked. This reading of Regulation 6 can come as no surprise to anyone, and least of all to the WBA. The preamble to its Regulations dedicates itself to ensuring that "all those boxers" who "by

their contributions of time, effort, risk and resources sustain the profession in existence" have the benefit of a "firm, intelligent and objectively administered control of the World Championships of boxing." Regulations, Preamble, ¶¶ 3, 4.

The language of Regulation 6 is clear and unambiguous: it means that plaintiff Ayala should be able to rely on the fact that as the third-ranked contender, two and only two men now stand between him and his turn for the title. This Court has no doubt that Ayala has a protectible property interest, as created by the WBA in Regulation 6, in having the opportunity to fight for the championship before any lower-ranked boxer.[25]

During the course of this litigation, both the WBA and Intervenor Arum have admitted that Regulation 6 creates an enforceable property interest. It is their position, however, that such an interest is conferred by the regulation *only* upon the Number One ranked contender, at the moment, Ayub Kalule. They argue that Regulation 6 means that the leading contender may exercise this property right as he sees fit, either deciding to fight for the championship himself, or conveying "his" right to fight for the title to *whomever* he wishes, regardless of ranking.

This Court finds that such a reading of Regulation 6 is completely untenable. The plain language of the regulation requires the champion to fight the "leading available contender" within ninety days. If Regulation 6 had been intended to confer this property right only upon the "leading contender," it would have said so. The regulation speaks, however, in terms of the leading *"available"* contender. That language can only mean that if the Number One ranked boxer is "unavailable" to fight, either because he is unwilling or unable to do so, the opportunity for the title must be given to the next available ranked boxer in line.

Despite the WBA's avowed dedication to protecting the interests of "all boxers" and of ensuring uniformity and fairness in the application of its regulations, defendant's interpretation of Regulation 6 would lead to gross abuses of the system. Under the WBA's view, the top-ranked fighter could, merely by declaring his "availability" and the "consenting" to his replacement by another fighter of *his* choice, permit anyone to fight for the championship without violating Regulation 6. Were this interpretation to prevail, however, promoters could obtain the WBA's championship sanction for any fight they wished, simply by "buying off" the Number One contender. Surely, Regulation 6 cannot be an invitation to wealthy, self-interested promoters to circumvent the rankings and extinguish the painfully-earned expectations of top-ranked boxers, merely by dangling tempting blandishments in front of the eyes of Number One.[26]

---

**25.** Because this Court finds that plaintiffs have a protectible property interest which has been adversely affected, we must also reject defendant's argument that plaintiffs lack standing. *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

**26.** The WBA's strained interpretation of Regulation 6 stems from the logically absurd proposition that because the top-ranked contender has the first crack at the championship, the Number Three ranked fighter suffers no injury when Number One gives away the opportunity to someone ranked lower than third. The detriment suffered by Ayala can best be understood by an analogy with which we all have experience. A person standing third in line to buy a ticket to the movies is clearly injured when the person at the head of the line allows the fourth person in line to buy the next ticket. Although only the first person in line has the right to buy the *next* ticket, *all* of the people in line have rights by virtue of their position. The first person in line may relinquish *his* right to buy the next ticket, but he cannot unilaterally consent to line-jumping because that action prejudices the legitimate expectations of everyone else on line and delays their purchases.

In this Court's view, the situation at hand is analogous. Because Charlie Weir has been allowed to step ahead of plaintiff Ayala in the line of fighters waiting their chance for a title bout, Ayala has lost a potential shot at the world championship that he may never get again. At the very least, Ayala's title opportunity has been delayed and, in a sport as uncertain as boxing, lost time can never be regained. By permitting Kalule, rather than the language of Regulation 6, to control who next fights for

Therefore, although the WBA's interpretation of its own regulation is entitled to deference, we cannot accept an argument that is obviously unjust, plainly erroneous and inconsistent with the purposes of the WBA regulations. *Lukens Steel Co. v. Klutznick,* 629 F.2d 881, 886 (3d Cir. 1980). The property interest conferred by Regulation 6 does not belong to the Number One contender alone, but rather gives plaintiff Ayala the right to expect that he will be offered the opportunity to fight the champion before *anyone* below him in the rankings.

## DENIAL OF PROPERTY WITHOUT PROCEDURAL DUE PROCESS

■ There is no question that plaintiffs have been denied the property interest they possess by virtue of Ayala's ranking and Regulation 6 without procedural due process of law. Although there is some uncertainty in the record, *see* n. 8, *supra,* it appears that the WBA sanctioned the Moore-Weir fight as a championship fight before this lawsuit was commenced. As of the date the action was initiated, plaintiffs were neither officially informed that a lower-ranked boxer would be getting a title bout nor were they informed of the reasons for that decision or given an opportunity to object. That not one iota of procedural due process was accorded plaintiffs is not surprising since the WBA and Intervenor Arum have consistently maintained before and during the litigation that Regulation 6 confers *no* property interest on Ayala. Therefore, because in the WBA's view, a Moore-Weir championship could be sanctioned without any regard for Ayala's interests or expectations without offending Regulation 6, it did not give Ayala's interests any consideration.

the championship, the WBA has sacrificed the interests of those fighters ranked above Charlie Weir in favor of a private promoter and has abdicated what it calls its "trusteeship" over the WBA Championship.

**27.** The Court finds the WBA's last-minute effort to suspend the application of a longstanding regulation reminiscent of a passage from Lewis Carroll's *Alice in Wonderland* recounting the Knave of Hearts' trial:

After this litigation began, and once the WBA realized that its interpretation of Regulation 6 might not be endorsed by this Court, it sought to change the rules "in the middle of the game" by invoking Regulation 19. The WBA claims that Regulation 19 gives it the complete discretion to suspend any other regulation, including Regulation 6, as long as the approval of the WBA President, two-thirds of the members of the Championships Committee, and a majority of the Executive Committee is obtained.

First of all, it is not at all clear that, by its own wording Regulation 19 was properly invoked. Plaintiffs argue that the Championships Committee which approved the Moore-Weir fight was improperly constituted since it did not contain the four regional vice-presidents of the WBA as required by By-law 2, ¶ 2. The response of the WBA and Intervenor Arum that the by-law was changed several years ago cannot be credited in light of their failure to provide the Court with any documentation of such a change. Under the only set of by-laws with which this Court has been provided, the WBA failed to comply with the requirements of Regulation 19 and therefore has not, as yet, suspended Regulation 6. This failure alone, coupled with the WBA's continuing sanction of the Moore-Weir fight in violation of Regulation 6, constitutes a denial of plaintiffs' due process rights.

Furthermore, this Court has serious doubt whether a denial of due process can be corrected by an *ex post facto* invocation of Regulation 19, after the Moore-Weir fight had been sanctioned and after plaintiffs had filed this lawsuit.[27]

"At this moment, the King who had been for some time busily writing in his note-book, called out 'Silence', and read out from his book, 'Rule Forty-two. *All persons more than a mile high to leave the court.*'
Everybody looked at Alice.
"*I'm* not a mile high," said Alice.
"You are," said the King.
"Nearly two miles high," added the Queen.

Even if Regulation 19 was invoked in accordance with its own terms, and at a proper time, it is clear that plaintiffs have still been denied procedural due process. Despite the fact that Regulation 19 gives the WBA discretion to suspend Regulation 6, such discretion must be exercised in accordance with procedural due process. This has been the law since at least 1926. In *Goldsmith v. Board of Tax Appeals,* 270 U.S. 117, 46 S.Ct. 215, 70 L.Ed. 494 (1926), the Supreme Court considered a situation in which the petitioner was a lawyer who had been refused admission to practice before the Board of Tax Appeals. The Board had published rules establishing criteria for admission to its bar. The Board's rules further provided that it could in its discretion deny admission to any applicant. The Board denied admission to petitioner under its discretionary power, without a prior hearing and a statement of reasons for the denial. Although the Court disposed of the case on other grounds, it stated, in an opinion by Chief Justice Taft, that the existence of the Board's eligibility rules gave the petitioner an interest and claim to practice before the Board to which procedural due process requirements applied. It said that the Board's discretionary power "must be construed to mean the exercise of a discretion to be exercised after fair investigation, with such a notice, hearing and opportunity to answer for the applicant as would constitute due process." *Id.* at 123, 46 S.Ct. at 217.

■ Procedural due process requires, at a minimum, that an aggrieved party receive an opportunity to be heard and a statement by the decisionmaker of the reasons for the outcome. *Kent v. United States,* 383 U.S. 541, 553, 86 S.Ct. 1045, 1053, 16 L.Ed.2d 84 (1966). It is undisputed that plaintiffs were given no opportunity to present their case before either President Sanchez or the Championships Committee nor does the record indicate that either of them gave plain-

tiffs or anyone else a reason for their decision to suspend Regulation 6. Although plaintiffs' counsel was afforded the opportunity to make a short statement to the Executive Committee on March 27, 1982, the record suggests that the outcome may have been predetermined and indicates that no reasons were given for the ultimate decision. Procedural due process demands more than a perfunctory hearing before a body that has virtually made up its mind, that refuses to give reasons for its decision and that was hastily marshalled in order to obviate a lawsuit.

## DENIAL OF PROPERTY WITHOUT SUBSTANTIVE DUE PROCESS

■ The WBA and Intervenor Arum contend that Regulation 19 affords the WBA complete discretion to suspend its other regulations for whatever reasons it deems appropriate. The law is quite clear, however, that although the WBA has the discretion under Regulation 19 to suspend Regulation 6, it must exercise that discretion in a non-arbitrary manner consistent with the purposes of its regulations.

In *Winsett v. McGinnes,* 617 F.2d 996 (3d Cir. 1980) (in banc), *cert. denied sub nom. Anderson v. Winsett,* 449 U.S. 1093, 101 S.Ct. 891, 66 L.Ed.2d 822 (1981), the Third Circuit confronted a situation in which a state prisoner who met all of the eligibility requirements established by department regulations was denied work release by prison authorities exercising discretion for reasons which plaintiff claimed were impermissible. The trial court had held, in the words of the Third Circuit, that:

"whenever a State conditions an otherwise protectible interest on the outcome of a highly discretionary process however arbitrary and inadequate in practice, the interest is defeasible and not entitled to due process safeguards."

"Well, I sha'n't go, at any rate," said Alice; "besides, that's not a regular rule: you invented it just now."

"It's the oldest rule in the book," said the King.

"Then it ought to be Number One," said Alice.

*Id.* at 1007. The Court of Appeals held that "[s]uch a construction of the relevant law is unacceptable." *Id.* The Court explained its reasoning:

"Although discretion is vested in the prison authorities to grant or deny work release, that discretion must be exercised consistently with the purpose and policy behind work release. We hold that a state-created liberty interest in work release arises when a prisoner meets all eligibility requirements under the state regulations and the exercise of the prison authorities' discretion is consistent with work release policy. We conclude that Winsett had a protectible liberty interest in work release because he met all eligibility criteria under the Delaware regulations and the considerations influencing the discretionary denial of work release, namely concern for public reaction and fear of legislative reprisals, were outside the legitimate bounds of the prison officials' discretionary power .... To hold otherwise, would mean that state-created interest in work release for eligible prisoners could be overriden simply by the prison officials' abuse of discretion."

*Id.*[28]

This view was followed in a case dealing with property, as opposed to liberty, interests, *Three Rivers Cablevision v. City of Pittsburgh,* 502 F.Supp. 1118 (W.D.Pa.1980). In that case, the court held that the low bidder on a city contract who claimed that the contract had been awarded to a party not in compliance with the relevant specifications, was entitled to "the non-arbitrary exercise by the city of its discretion in making the award." *Id.* at 1131. As Judge Adams stated in *Block v. Potter,* 631 F.2d 233, 236 (3d Cir. 1980), "[a] legislative grant of discretion does not amount to a license for arbitrary behavior .... [A] state statute may not sanction totally arbitrary decisions founded on impermissible criteria."

■ Although the WBA announced no rationale for its decision to invoke Regulation 19 at the time the decision was made, both the WBA and Intervenor Arum have argued before this Court that the discretion to suspend Regulation 6 may be exercised under two conditions: (1) the leading contender consents and (2) the fight to be sanctioned would, in the view of the WBA and the promoter, generate greater fan interest and revenue than would the fight that would otherwise take place according to Regulation 6.[29]

With respect to the first condition, we have already held that the consent of the Number One ranked fighter cannot serve to extinguish the rights of all other ranked fighters to the entitlements created by Regulation 6. Therefore, his consent *alone* cannot be a factor upon which the WBA suspends Regulation 6 to the detriment of plaintiffs.

Moreover, with respect to the second condition, this Court strenuously rejects the proposition that the WBA can obliterate plaintiffs' property interest because a promoter, such as Intervenor Arum, or even the WBA itself, determines that an alternative match would generate greater interest on the part of fans and greater revenues for the promoter.

Although we doubt that anyone is capable of accurately assessing the desires of the "fans" at any particular time, it is certain that plaintiffs' hard-won property rights, which the WBA has obligated itself to protect, cannot be discarded because a fight promoter claims to have divined that this is the will of the boxing patrons of South Africa and because the promoter stands to reap considerable economic bene-

**28.** The WBA and Intervenor Arum have not argued, as the defendants did in *Winsett,* that the existence of Regulation 19 and the discretion it confers on the WBA divests plaintiffs of *any* protectible property interest they may have had in Regulation 6. They have argued, instead, that Regulation 6 confers a property interest only on the Number One contender. *See*

pp. 718–719, *supra.* To the extent the former argument could have been raised here, it was explicitly rejected by the Third Circuit in *Winsett, supra,* at 1006.

**29.** Aff. of Robert Arum, Apr. 12, 1982, ¶¶ 2, 3; Statement of James J. Binns, Tr. of Mar. 31, 1982 at 41–43.

fit. Any interpretation of these regulations which would permit the WBA to sacrifice its fighters' interests for such reasons would be totally abhorrent to the express purposes of the WBA Constitution, By-laws and Regulations.

The WBA itself has at other times rejected the analysis it now presents to this Court. Luis Batista Salas, President of the World Championships Committee, stated in a letter directed to President Sanchez that "[w]e know that economic interests are very important, but the WBA cannot permit financial interest to frustrate the meaning of our Constitution and our Bylaws." Referring to the situation in another weight class, Salas stated:

> "It is allege [sic] that a fight with the leading contender would not produce money. This contractual consideration is not enough reason to break the regulations  If we accept this argument, we would convert international boxing in [sic] a sport exclusively governed by the box office. What would happened with [sic] the thousand [sic] boxers of all the world who risk their lives in the ring in order to fight one day for a Championship? "

See n. 15, supra.

## CONCLUSION

Plaintiff Ayala, who for all intents and purposes has been stripped of his ranking and its attendant benefits, is entitled to the protection of this Court. He has asked us to enjoin the Moore-Weir fight altogether. This we cannot do. Moore may fight Weir, or anyone else he chooses, for he is a private person and may fight for fun or for profit without review by this Court. But the WBA is another matter. Its power to sanction that fight by awarding a championship to the victor is a *governmental* act. Therefore, although this Court cannot prevent a Moore-Weir bout from taking place in South Africa on April 24, 1982, four days hence, it can ensure that plaintiff's due

process right to his turn at the championship is protected. Accordingly, this Court will hereby enter a permanent injunction directing the WBA to revoke its sanction of the Moore-Weir fight as a championship fight.[30]

The Court wishes to make clear that had it entered a temporary restraining order, as plaintiffs requested, such an order, which would remain in effect for 10 days, would have been unreviewable by an appellate court. This Court, of course, has no desire to insulate itself from review, and has therefore determined that it will not enter a TRO. After three oral hearings, several rounds of briefs, and extensive depositions, we see no reason why the injunction issuing today should not be a final one, especially in view of the fact that plaintiffs seek only injunctive relief. However, while the Court is willing to make it possible for defendant and Intervenor Arum to obtain appellate review, the Court believes that any stay of its order pending appeal would work a grave injustice on plaintiffs.

Plaintiffs have fully expedited their prosecution of this action in an effort to obtain a result well before the date of the Moore-Weir fight.

This suit was filed on March 4, 1982, along with an Order to Show Cause why temporary restraints should not issue. At a hearing held on March 8 on plaintiffs' application for temporary restraints, Intervenor Arum was represented by counsel while the WBA, notified of the hearing four days previously, was represented by its Second Vice-President, Robert W. Lee. At that hearing, in spite of the Court's warning that they might be prejudiced, both defendant and Intervenor Arum requested that the matter be postponed until March 31, 1982, so that the Championships Committee would have a chance to consider the matter at its meeting in St. Maarten on March 27, 1982. Tr. of Mar. 8, 1982 at 6, 18. At that point, the Court stated:

---

**30.** Plaintiffs have also sought an injunction directing the WBA to strip Moore of his title if he does not fight the leading available contender

by May 2, 1982. A grant of such relief would be premature at this time.

"I'll give you time, but ... I would think that it is in your interest to know sooner rather than later whether the plaintiff is right or wrong. Because, if he's right, you're going to have a lot of trouble."

*Id.* at 6. The Court continued:

"I'm prepared to decide [this matter] early so that you aren't entangled with commitments and contracts. The only reason that I am not deciding it today or tomorrow or next week is because it is the defendant who is asking for more time. Therefore, if more time is given because the defendant wants more time, I will not hear from you later if you claim that even though the plaintiffs should win, I should not give them the full measure of relief because in the interval you have committed yourself and entangled yourself in contracts."

*Id.* at 15.

Following the March 31 hearing, plaintiffs were directed to begin discovery immediately on the question of the validity of the WBA's invocation of Regulation 19, and to file a brief on the issue within five days. Plaintiffs fully complied with these instructions. Upon the receipt of responsive papers submitted by the WBA and Intervenor Arum, this matter was set down promptly for a hearing on April 20, 1982. It is clear, then, that any delay since the commencement of the action has been occasioned by the WBA and the Intervenor.

A stay now, granted simply to review whether both the plaintiffs *and* this Court are correct, would irrevocably deprive plaintiffs of the fruits of their victory in this Court. If the Moore-Weir fight takes place on April 24, 1982, as a WBA championship bout, as the result of a stay pending appeal, any subsequent injunctive relief would be pointless. Weir, the fourth-ranked contender, would have had his championship opportunity ahead of the third-ranked Ayala, with all of the publicity, prestige and pecuniary advantages that go with it.

### ORDER

For the reasons stated in the opinion of the Court filed on this day,

It is on this 20th day of April, 1982,

ORDERED that defendant World Boxing Association be, and it hereby is, directed to revoke any sanction which it has given to the fight between Davey Moore and Charlie Weir, now scheduled for April 24, 1982, as a fight for the WBA Junior Middleweight Championship; and it is further

ORDERED that defendant World Boxing Association be, and it hereby is, directed not to sanction the fight between Davey Moore and Charlie Weir as a fight for the WBA Junior Middleweight Championship.